## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| MAKHTESHIM AGAN OF NORTH AMERICA, INC., d/b/a ADAMA, a Delaware corporation; and ALLIGARE, LLC, a Delaware limited liability company, | Case No. |
| | **COMPLAINT** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| JEFFREY W. WELSH, an Alabama resident; HAYLEY H. WELSH, an Alabama resident; WELSH HOLDINGS, INC., an Alabama corporation; FERROSAFE, LLC, a limited liability company; FERROSAFE HOLDINGS, LLC, a limited liability company; FERROVIA SERVICES, LLC, a Delaware limited liability company; RUMBLE SPRAY, INC., a Washington corporation; MARK R. GARDNER, an Alabama resident; WILLIAM ALLEN BLYTHE, an Alabama resident; ROBERT B. "BO" HARWELL, a Mississippi resident; MATTHEW D. ZOOST, a Nevada resident; and RYAN CAMMACK, an Alabama Resident, | |
| Defendants. | |

## I.     INTRODUCTION

1.     After Plaintiff Makhteshim Agan of North America, Inc., d/b/a ADAMA ("ADAMA") took a controlling stake in Plaintiff Alligare LLC ("Alligare"), Alligare's founder, Defendant Jeff Welsh, conspired with a group of loyal Alligare employees to create a separate business operating in the same industry as Alligare and ADAMA. That separate business is comprised of Defendants Ferrovia Services LLC, Ferrosafe Holdings LLC, Ferrosafe LLC, and Rumble Spray Inc. (the "Ferrovia/Ferrosafe Entities")—a group of entities with close financial ties to Welsh and his associates (the "Individual Defendants"). Through the Ferrovia/Ferrosafe Entities, the Individual Defendants conducted business with Alligare while hiding their divided

COMPLAINT - 1

loyalties and guiding valuable business assets to the Ferrovia/Ferrosafe Entities to enrich themselves at Plaintiffs' expense.

2.    ADAMA is the American subsidiary of an Israeli company. ADAMA manufactures and sells agrochemical crop-protection and non-crop protection products throughout North America. In 2006, ADAMA invested in Alligare. Welsh, Alligare's founder, and his wife, Defendant Hayley Welsh, co-owned Alligare through Defendant Welsh Holdings, Inc. ("WHI").

3.    Alligare is an Alabama-based company that buys agrochemical products and sells them through distribution partners and at retail. The partnership between Alligare and ADAMA started successfully: Alligare sold and distributed ADAMA's products and generated profits for ADAMA and the Welshes. However, as ADAMA invested more and became Alligare's majority owner, Welsh bristled at having to answer to Alligare's new management.

4.    Welsh and Defendants Bo Harwell—his brother-in-law and Alligare's former counsel—and Mark Gardner devised a scheme to enrich themselves at Plaintiffs' expense. With the other Individual Defendants' help, the trio created, financed, and managed the Ferrovia/Ferrosafe Entities. Welsh and "his people" at Alligare, became directors, officers, employees, or owners of the Ferrovia/Ferrosafe Entities—even while outwardly serving Alligare. In fact, Gardner served as CFO for **both** Alligare and the Ferrovia/Ferrosafe Entities for during a four-year period.

5.    Welsh and his team steered Alligare's business in the Ferrovia/Ferrosafe Entities' favor: They made contracts between Alligare, Ferrovia, and Ferrosafe that favored the Ferrovia/Ferrosafe Entities, and they conspired to have Alligare assign Ferrovia lucrative business assets related to the railway industry. Some rank-and-file Alligare employees knew about Defendants' misconduct. Welsh, however, had an explosive temper and a confrontational interpersonal style that created a climate where fearful low-level employees stayed silent to avoid provoking reprisals.

6.    In 2019, tensions with Welsh finally boiled over and ADAMA bought out WHI's remaining interest in Alligare for $5.3 million to become Alligare's sole owner. Before the buyout,

K&L GATES LLP
200 SOUTH BISCAYNE BLVD, # 3900
MIAMI, FLORIDA, 33131-2399
TELEPHONE: (305) 539-3300

however, Welsh and Gardner caused Ferrovia to order from Alligare far more products than Ferrovia actually needed or expected to continue ordering. This increased the revenue figure used to calculate WHI's buyout price. After the buyout occurred, Ferrovia returned a significant portion of products it had purchased and sharply reduced its purchasing volume such that Alligare's revenue in the year before Welsh's departure was not a fair indicator of what Welsh knew to be Alligare's expected future performance.

7.      Simply put, Welsh and Gardner falsely inflated WHI's buyout price by using Ferrovia—an entity in which they secretly had pecuniary interests—to load Ferrovia's purchases at an unsustainable level to make them count toward WHI's buyout price. Moreover, the Welshes never revealed to ADAMA, when it bought WHI out, that Jeff Welsh had close financial ties to the Ferrovia/Ferrosafe Entities. Nor did Harwell—who represented WHI in the buyout transaction—disclose his own relationship with those entities.

8.      Throughout, Welsh often bragged that he did not care if ADAMA or Alligare discovered his misdeeds, stating something to the effect of "[n]o way those Jews will win anything in Lee, County Alabama. Bring it on."[1]

9.      Defendants have committed federal securities fraud, violations of the Defend Trade Secrets Act, and numerous state law torts and contractual breaches. Because of their conduct, Alligare and ADAMA have suffered millions in damages.

## II.      THE PARTIES

10.      Plaintiff ADAMA is a Delaware corporation with its main offices in Raleigh, North Carolina, and Aventura, Florida. ADAMA's senior management team in the United States is comprised of residents of Miami-Dade County, Florida. Additionally, ADAMA has a mailing address and physical offices in Aventura, Florida.

---

[1] Undersigned counsel do not subscribe to this stereotype of Alabama's justice system that Welsh apparently subscribes to.

K&L GATES LLP
200 SOUTH BISCAYNE BLVD, # 3900
MIAMI, FLORIDA, 33131-2399
TELEPHONE: (305) 539-3300

11.    Plaintiff Alligare is a Delaware limited liability company with its main office in Alabama. Alligare's board members reside in Miami-Dade County, Florida.

12.    Defendant Welsh is an Alabama resident. He is Mrs. Welsh's spouse, and he controls or is part of a group that controls the Ferrovia/Ferrosafe Entities as a director, equity owner, or officer.

13.    Defendant Hayley H. Welsh is an Alabama resident. Mr. Welsh is her spouse, and Harwell is her brother.

14.    Defendant WHI (together with Mr. and Mrs. Welsh, the "Welshes") is an Alabama corporation with its main office in Alabama. Mr. and Mrs. Welsh are co-owners and directors of WHI.

15.    Defendant Ferrovia is a Delaware LLC with its main office in Alabama.

16.    Defendant Ferrosafe Holdings is an Arizona LLC with its main office in Washington State.

17.    Defendant Ferrosafe is an Arizona LLC with main offices in Washington State and Arizona. On information and belief, Ferrosafe also includes a since-dissolved Mississippi LLC that was its predecessor entity and that also used the name "FS Holdings."

18.    Defendant Rumble Spray Inc. ("RSI") is a Washington State corporation with its main office in Washington.

19.    Defendant Harwell is an attorney licensed in Mississippi, where he resides. He is Mrs. Welsh's brother and Mr. Welsh's brother in law.

20.    Defendant Gardner is an Alabama resident.

21.    Defendant W. Allen Blythe is an Alabama resident.

22.    Defendant Matthew Zoost is a Nevada resident.

23.    Defendant Ryan Cammack is a South Dakota resident.

//

//

//

COMPLAINT - 4

### III.   JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert causes of action arising under the laws of the United States.

25.     The Court has supplemental subject matter jurisdiction over the parties' state law claims under 28 U.S.C. § 1367(a).

26.     The Court has personal jurisdiction over Welsh, Gardner, Harwell, WHI, and the Ferrovia/Ferrosafe Entities because ADAMA's and Alligare's claims arise out of those Defendants' contacts with Florida. For example, and without limitation:

      a.     Welsh traveled to, and caused his subordinates to travel to, Florida;

      b.     Gardner traveled to Florida;

      c.     Jeff Welsh, Gardner, and Harwell also, directly or through intermediaries, sent and received emails to and from; had phone calls with; and sent and received drafts of documents to and from, people located in Florida and in this district, or people they knew would transmit those communications to people located in Florida and in this district.

      d.     They acts described in ¶¶ 26.a–c occurred while (i) negotiating, drafting, executing, and performing ADAMA's purchases of equity in Alligare and agreements providing for the same; (ii) seeking review, comment, and approval from representatives of Alligare and ADAMA located in Florida of agreements to which Alligare is or was a party (as detailed below); and (iii) when communicating with representatives of Alligare and ADAMA located in Florida.

      e.     The documents mentioned in ¶¶ 26.c–d include various versions of: (i) agreements and related documentation related to ADAMA's equity purchase in Alligare; (ii); contracts between Alligare and its customers, including without limitation the Ferrovia/Ferrosafe Entities; (iii) contracts between Alligare and its executive level employees; and (iv) corporate governance materials such as board resolutions, written consents, and meeting minutes relating to the items in (i), (ii), and (iii).

K&L GATES LLP
200 SOUTH BISCAYNE BLVD, # 3900
MIAMI, FLORIDA, 33131-2399
TELEPHONE: (305) 539-3300

f.      Welsh, Gardner, and Harwell did this in their capacities not only as officers of (and in Harwell's case counsel for) Alligare, but also in their capacities as agents of the Ferrovia/Ferrosafe Entities (and in Welsh's case, an agent of WHI).

g.      In and during these communications and travels, Welsh, Gardner, Harwell, WHI, and the Ferrovia/Ferrosafe Entities made the misleading statements described in this complaint.

h.      Representatives of Alligare and ADAMA, including Martin Blank, Shaul Friedland, and others located in Florida received these communications (as described in greater detail below), reviewed them, responded to them, and relied on them being complete and accurate while in Florida.

27.      In addition to Welsh, Gardner, Harwell, WHI, and the Ferrovia/Ferrosafe Entities, the Court has personal jurisdiction over the other Defendants because, on information and belief, they conspired in, approved of or acquiesced in, and participated in the acts described in ¶ 26. These Defendants also actively concealed from and failed to disclose to (in spite of duties to the contrary) representatives of Alligare and ADAMA located in Florida these Defendants' involvement in the wrongful conduct described above and described below in greater detail.

28.      In addition, because of the events described in ¶¶ 26–27, the Court also has pendent personal jurisdiction over all Defendants under the doctrine articulated in *Sierra Equity Grp., Inc., v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213 (S.D. Fla. 2009) (citing *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1181 (9th Cir. 2004); *ESAB Grp. v. Centricut, Inc.*, 126 F.3d 617, 628 (4th Cir. 1997); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir.1993)); 4A Charles Alan Wright & Arther R. Miller, FED. PRAC. & PROC. § 1069.7, n.31 (4th ed. 2020); and because Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) authorizes nationwide personal jurisdiction and service of process.

29.      Venue is proper in this district under Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b)(2), or in the alternative, § 1391(b)(3).

COMPLAINT - 6

30.     All conditions precedent to bringing this action have occurred, have been performed, or have been waived.

## IV.    FACTUAL ALLEGATIONS

**A.**     **ADAMA, a crop protection company, acquires 30% of Alligare in an effort to expand the market for ADAMA's products.**

31.     ADAMA is the U.S. subsidiary of the Israeli company Adama Agricultural Solutions Ltd. ADAMA manufactures pesticides, herbicides, insecticides, and fungicides and sells them to wholesalers.

32.     Those wholesalers, in turn, sell to retail customers, many of whom are "pesticide applicators." Applicators use these products to protect crops or control vegetation for themselves or for clients in various industries.

33.     ADAMA operates with great care for its impact on the environment and the people and animals who rely on it. To that end, ADAMA actively engages in environmental stewardship and adheres to governing federal and state regulatory regimes.

**1.     ADAMA acquires a stake in Alligare with an option to buy it outright, and Welsh receives an option to force such a buyout.**

34.     Defendant Jeff Welsh founded Alligare in 2002. Alligare is a wholesaler that buys chemical products from manufactures and distributes them under its private label to applicators for in the industrial, forestry, livestock, aquatic, and transportation sectors, as well as end users that apply these chemicals for their own accounts. Prior to 2006, ADAMA's business focused mainly on the agricultural sector. It thus saw Alligare's diverse industry portfolio as a way to grow ADAMA's retail market.

35.     In March 2006, ADAMA, Alligare, Welsh, WHI, and Welsh's former business partner (not a party to this case), contracted for ADAMA to acquire 30% equity in Alligare. The 2006 acquisition agreement gave ADAMA a "First Option" to acquire up to 70% of Alligare and a "Second Option" to acquire all of it. Critically, this agreement also gave Welsh a "Put Option" to force ADAMA to buy all of WHI's equity interest in Alligare under certain circumstances.

COMPLAINT - 7



36.     The firm Brunini, Grantham, Grower & Hughes PLLC represented Welsh, WHI, and Alligare in this transaction. Jeff Welsh's brother-in-law, Defendant Bo Harwell, worked for Brunini as an associate the time and, on information and belief, assisted in representing Welsh, WHI, and Alligare in the 2006 transaction.

37.     Following this transaction, ADAMA appointed a person to Alligare's board of managers, who served as a director alongside Welsh and his non-party former partner.

38.     Bo Harwell continued advising Alligare as its primary outside counsel.

**2.  Tensions grow between Welsh and his business partners as ADAMA takes a more active ownership and management role in Alligare.**

39.     Initially, business proceeded without incident; Welsh ran Alligare with relatively little oversight. Alligare generated cash profits, portions of which were distributed to Alligare's members.

40.     In 2008, ADAMA exercised its First Option and increased its ownership stake in Alligare from 30% to 70%. In or around January 2010, Alligare's other founder exited, and ADAMA bought another 10%, bringing its total ownership of Alligare to 80%. This allowed ADAMA to appoint additional board members. Welsh now sat on the board alongside Shaul Friedland, Amir Ellenbogen, and Martin Blank of ADAMA. Messrs. Friedland and Blank both reside in Florida.

41.     In 2012, Welsh and Alligare entered an Employment and Noncompetition Agreement ("Employment Contract") codifying the terms of Welsh's employment as President of

K&L GATES LLP
200 SOUTH BISCAYNE BLVD, # 3900
MIAMI, FLORIDA, 33131-2399
TELEPHONE: (305) 539-3300

Alligare and requiring him, among other things, not to compete with Alligare or solicit its clients or employees. The Employment Contract required Welsh to "report directly to" Alligare's board, whose other members reside in Florida and/or abroad.

42.     Although Harwell was Alligare's outside general counsel, he represented Welsh personally in negotiating the Employment Contract—even though this meant he represented two clients on opposite sides of the same transaction, in violation of his professional ethical duties. As an attorney, Harwell had a free-standing legal duty to refrain from undertaking this representation absent a written waiver signed with the informed consent of both Welsh and Alligare.

43.     Before ADAMA became Alligare's majority owner, Welsh ran Alligare at his whim, demanding unquestioning loyalty from his workers. Alligare's governance practices—board meetings, votes, etc.—were haphazard. Welsh did not maintain organized records, or answer to anyone, and was not used to people challenging his ideas or business plans.

44.     Perhaps unsurprisingly, Welsh thus rejected the efforts of Alligare's new Florida-based board to instill better governance and oversight practices. Similarly, Welsh berated people who challenged or him or who tried to question his decisions. This created a climate of fear for many employees, who were unable to question Welsh and unwilling to report his misconduct for fear of how Welsh would respond. This may have worked when Welsh ran Alligare for himself. Now, however, he was supposed to be part of a shared enterprise and accountable to others. Yet he failed to adjust his behavior to this new governance structure.

45.     Ultimately, Welsh came to resent the board members he reported to, even as his subordinates were too concerned to inform the board about Welsh's flawed management style. On information and belief, Welsh found this new reality particularly frustrating because he felt he was answering to a group of outsiders that had taken over his company.

46.     Plaintiffs are informed and believe that Welsh, Mark Gardner (Alligare's then-CFO who was loyal to Welsh), and Allen Blythe (Alligare's then Director of Operations, also loyal to Welsh), thus devised to start a separate venture to better enrich themselves without any officious

K&L GATES LLP
200 SOUTH BISCAYNE BLVD., # 3900
MIAMI, FLORIDA, 33131-2399
TELEPHONE: (305) 539-3300

involvement from Alligare's new management. On information and belief, they also decided to enlist Harwell to assist with this effort.

**B.** **Defendants work to steer Alligare's business to favor the Ferrovia/Ferrosafe Entities.**

      **1.** **Welsh and Harwell execute the Railroad Services Contract on Alligare's behalf and found Ferrosafe to take advantage of this.**

47. Beginning in or around late 2011 and early 2012, Welsh and Harwell, began negotiating an agreement (the "Railroad Services Contract") for Alligare to provide pesticide application services for a large railway company ("Company A").[2] Welsh on behalf of Alligare executed the Railroad Services Contract on July 29, 2013.

48. Recall that Alligare is a wholesaler that sells agro-chemical products to "pesticide applicators." Pesticide applicators (also called just "applicators) are companies that use agro-chemical products to control vegetation for clients in various sectors, that is, they apply the pesticides. Although Alligare itself is not an applicator, under the Railroad Services Contract, it would subcontract application services to various applicators and supervise the work they performed for Company A.

49. In connection with fulfilling its obligations under the Railroad Services Contract, Alligare developed a proprietary software system (the "Software") to aid in supplying agrochemical products for subcontractors working for Company A and coordinating and managing the subcontractors' work for Company A. The Software allowed Alligare to plan vegetation management plans for customers and monitor the results, taking into account various other factors potentially affecting plan performance. In addition, the Software contained a vast database of information related to customer orders, product supplies and inventory, and customer demand. Alligare developed the Software over a five-year period at great expense.

---

[2] Due to confidentiality provisions in the Railroad Services Contract, and to protect Company A's privacy, this complaint uses a pseudonym to refer to the counterparty to the Railroad Services Contract.

K&L GATES LLP
200 SOUTH BISCAYNE BLVD, # 3900
MIAMI, FLORIDA, 33131-2399
TELEPHONE: (305) 539-3300

50.     Alligare's board was generally aware of Welsh and Harwell's efforts related to the Railroad Services Contract. Welsh, for example, presented the Railroad Services Contract with Company A to personnel in Florida as a lucrative opportunity for Alligare to enter the large market for supplying applicators in the railway sector.

51.     Shortly **before** execution of the Railroad Services Contract, however, on or around June 20, 2013, Harwell and his wife Kristen Harwell created Defendant Ferrosafe as a Mississippi LLC. Plaintiffs are informed and believe that the timing of this formation was no coincidence; Ferrosafe is an agro-chemical applicator, and the Harwells created Ferrosafe in anticipation of benefitting from the Railroad Services Contract by, among other things, receiving applicator subcontracts from Alligare. On information and belief, they did this with Welsh's knowledge, inducement, and approval; and the Individual Defendants planned to have Ferrosafe act as an Alligare subcontractor without revealing their involvement.

52.     Alligare and ADAMA were completely unaware that: (1) the Harwells had founded Ferrosafe shortly before the Railroad Services Contract was signed; (2) the Individual Defendants had close financial ties to Ferrosafe (*see* Pt. IV.E, below); and (3) Welsh, Harwell, Gardner, and the other Individual Defendants save Hayley Welsh were acting, and planned to continue acting, to enrich themselves and the Ferrovia/Ferrosafe Entities at Alligare's expense including, without limitation, by way of the Railroad Services Contract.

53.     Moreover, while some of Alligare's mid-level employees were aware of Welsh's and Gardner's involvement in the Ferrovia/Ferrosafe Entities, Welsh falsely told them that ADAMA's in-house counsel, Mark Hough, was aware of and had signed off on the arrangement.

> **2.  The Ferrovia/Ferrosafe Entities undergo one or more transactions, on information and belief, in order to acquire and monetize the Railroad Services Contract without revealing the Individual Defendants' involvement.**

54.     On information and belief, beginning in or around 2015, the Ferrovia/Ferrosafe Entities engaged in one or more transactions (the "Transaction").

COMPLAINT - 11

K&L GATES LLP
200 SOUTH BISCAYNE BLVD, # 3900
MIAMI, FLORIDA, 33131-2399
TELEPHONE: (305) 539-3300

55.     On information and belief, the Transaction involved Ferrosafe acquiring part[3] of RSI, another applicator company based in Washington State; the joint entity prepared to enter the railway sector using the name Ferrosafe. In December 2015, Ferrosafe and Ferrosafe Holdings were created in Arizona, and the name of the Mississippi Ferrosafe entity the Harwells had created in 2013 was changed to "FS Holdings LLC."  That Mississippi entity apparently had no further purpose (perhaps it was a non-surviving merger entity) and was administratively dissolved in November 2016.

56.     In late 2016, Harwell formed Ferrovia, another applicator, in Delaware.

57.     Corporate filings submitted during this time indicate that Gardner was the CFO of some or all of the Ferrovia/Ferrosafe Entities despite still working as CFO for Alligare.

58.     Given that the relevant information is solely within Defendants' control, Plaintiffs' understanding as to the exact nature of the Transaction is necessarily incomplete; though it seems likely, and Plaintiffs therefore allege on information and belief, that the Transaction involved a merger between RSI and the old Ferrosafe Mississippi entity with or into Ferrosafe and Ferrosafe Holdings (the Arizona entities) and becoming subsidiaries or affiliates of Ferrovia.

59.     Plaintiffs are informed and believe, however, that at least one goal of the Transaction was to create a corporate structure for the Ferrovia/Ferrosafe Entities and their owners, directors, and officers to benefit from the Railroad Services Contract. As Karl Moore—a non-party who purports to be the Chief Business Officer of Ferrosafe—states on a public webpage, the Transaction was "driven by the opportunity to acquire and maximize profitability of a long term services agreement."[4] Plaintiffs are informed and believe that this services agreement was the Railroad Services Contract.

---

[3] RSI remains an active corporation in Washington. Thus, Plaintiffs are informed and believe that Ferrosafe acquired only part of RSI, perhaps via merger with a subsidiary or a purchase of business assets.

[4] Karl Moore, ANGELLIST (describing his achievements as Chief Business Officer of Ferrosafe), *available at* https://angel.co/karl-moore as of February 27, 2020.

K&L GATES LLP
200 SOUTH BISCAYNE BLVD, # 3900
MIAMI, FLORIDA, 33131-2399
TELEPHONE: (305) 539-3300

60.     The Ferrosafe/Ferrovia Entities control, are controlled by, or are under common control with each other; and Welsh, Gardner, Harwell, Cammack, Blythe, and Zoost are affiliated with some or all of those entities as officers, directors, owners, or employees. The facts on which Plaintiffs base these allegations are set forth in Part IV.E of this complaint. *See* ¶¶ 90–102.g. Plaintiffs did not know about this common affiliation and control until early 2020.

61.     During the same 2016 timeframe in which the Transactions occurred, Ferrosafe began contracting with Alligare. Alligare, unaware of this entity's involvement with its own insiders, believed these dealings were occurring in the ordinary course of its business and at an arm's length. At no point did any of Welsh, Gardner, Harwell, Cammack, Blythe, or Zoost reveal their involvement with the Ferrovia/Ferrosafe Entities.

### 3. Welsh deceives Alligare into transferring the Railroad Services Contract and the Software to the Ferrovia/Ferrosafe Entities and works with Harwell and Gardner to accomplish this.

62.     Beginning in 2016, Welsh approached Alligare's board and told its members that he believed supplying applicators and subcontracting for them to service railway operators was no longer profitable, compared to profits Alligare would earn by entering an exclusive supply agreement with Ferrovia—another of Alligare's applicator customers—under which Ferrovia would guarantee Alligare a profit margin on products that Ferrovia bought.

63.     For instance, at a board meeting in Aventura, Florida in August 2016, Welsh presented materials indicating that Alligare's profit on the application services was low and the gross margin percentage would rise if Alligare ceased managing application services for Company A. Welsh and Gardner made similar representations in calls and communications with Alligare and ADAMA personnel located in Florida.

64.     Welsh, Gardner, Harwell, Cammack, Blythe, and Zoost encouraged and allowed Alligare to believe it was dealing with Ferrovia at an arm's length, never revealing their involvement with the Ferrovia/Ferrosafe Entities.

COMPLAINT - 13

65.     Welsh advised Alligare—without disclosing his, Gardner's, or Harwell's involvement with the Ferrovia/Ferrosafe Entities—that Ferrovia was amenable to entering an agreement under which Ferrovia would assume the Railroad Services Contract and buy exclusively from Alligare all of the products needed to service Company A. As part of this, Ferrovia would purchase products at a set pricing level, thereby guaranteeing Alligare a profit margin on the products Ferrovia purchased.

66.     These statements about what Ferrovia was offering were false, just as Welsh's failure to disclose his own involvement with that entity was tantamount to an affirmative falsehood.

67.     Ferrovia was not actually offering to guarantee a profit margin to Alligare, nor to buy products exclusively from Alligare; rather, Ferrovia wanted to buy from Alligare only those products it could not obtain at a better price from other suppliers. In addition, Welsh knew that entering a supply arrangement with Ferrovia would be less profitable for Alligare than it would be for Alligare to simply retain the Railroad Services Contract. On information and belief, he knew this because, *inter alia*, transferring the Railroad Services Contract would mean that Ferrovia would control all of the Company A subcontracts that Alligare controlled as the holder of the Railroad Services Contract.

68.     Plaintiffs are informed and believe that Welsh made these misleading statements and omissions to provide cover if he was later questioned about why it was that he had begun working to move the Railroad Services Contract off of Alligare's books and onto Ferrovia's.

69.     Welsh and Gardner began to "negotiate" with Ferrovia an Assignment and Supply Agreement ("Assignment") for Alligare to assign the Railroad Services Contract to Ferrovia. Harwell represented Alligare on the deal—again in violation of his professional responsibilities, given that he also benefitted financially from and, on information and belief, gave legal advice to the Ferrovia/Ferrosafe Entities. The trio's efforts involved, among other things, negotiating with Company A to obtain Company A's consent for Alligare to assign the Railroad Services Contract.

COMPLAINT - 14

70.     Welsh later presented a draft version of the Assignment to Alligare's board and to ADAMA's general counsel for review. The draft he presented, though, omitted two key contract clauses contained in the final version of the Assignment: First, in the final version of the Assignment, Alligare transferred the Software to Ferrovia. Second, the final Assignment contained a modified pricing term under which Ferrovia was excused from its obligation to purchase products exclusively from Alligare if it could find those products at a better price from an alternate supplier. In the version of the Assignment provided to Alligare's board and to ADAMA's general counsel, Ferrovia could avail itself of the more lenient pricing terms only if an unforeseeable market event outside the parties' control made it necessary to do so.

71.     As stated above, the Software is a proprietary computer program of considerable value that was used for monitoring and coordinating pesticide application services, as well as ordering, product performance, billing, and customer information related to the provision of those services. Likewise, the guaranteed pricing provision that Alligare thought Ferrovia was offering, consistent with Welsh's representations and the draft version of the Assignment that Welsh provided to Plaintiffs, was of considerable value because it guaranteed Alligare a profit margin on the sale of its products and committed Ferrovia to purchasing exclusively from Alligare. On information and belief, Welsh purposely did not include the clauses transferring the Software and modifying the pricing and exclusivity terms in the draft Assignment he presented to Plaintiffs because he knew they would refuse to permit assignment of the Software or modification of the pricing terms.

72.     In justifying the Assignment, Welsh repeated his false assertion that he believed it would be more profitable for Alligare to assign the Railroad Services Contract and instead focus on supplying chemicals at a guaranteed margin rather than subcontracting, managing and coordinating application services for Company A. This was misleading given that Welsh intended to and did remove any price protection for Alligare by modifying the pricing terms as described above. Moreover, Welsh, Gardner, and Harwell never disclosed to Alligare that they all had pecuniary interests in the Ferrovia/Ferrosafe Entities. On information and belief, Welsh, Gardner,

COMPLAINT - 15

and Harwell did not tell Company A either that they were on both sides of the assignment transaction for which they sought and obtained Company A's consent.

73.     Purporting to act for Alligare but lacking valid authorization, Welsh executed the Assignment with Ferrovia on March 15, 2017. Defendant Blythe signed on behalf of Ferrovia—even though he still worked for Alligare and would continue in his role at Alligare until the following month.

74.     The Assignment transferred to Ferrovia the Railroad Services Contract, the Software, and all of Alligare's subcontracts with various applicators to work on the Railroad Services Contract. In return, Ferrovia paid approximately $80,000 for the Software and agreed to purchase from Alligare all chemicals needed for Ferrovia to perform the Railroad Services Contract.

75.     This was a net loss for Alligare. Not only did it no longer have the valuable Railroad Services Contract, but it now had fewer retail customers for its products in the rail sector. Nor did it have the Software, and the modified pricing term meant that its "exclusive" supplier status and guaranteed pricing were essentially subject to modification at Ferrovia's pleasure. Ferrovia, on the other hand, now controlled the Software, the Railroad Services Contract and all of its associated subcontracts, and had the ability to essentially force Alligare to match prices available from other suppliers on a given product at the risk of losing Alligare's exclusive supplier status as to that product.

76.     Business continued as usual. Alligare was unaware of the deceit and unable to exercise oversight of Welsh: Employees remained too loyal or too scared to challenge him or believed falsely that ADAMA's general counsel knew about and approved of his double-dealing. Throughout the entire time that Alligare did business with the Ferrovia Ferrosafe Entities, Welsh, Gardner, and Harwell never revealed that they were playing both sides—nominally showing loyalty to Alligare while simultaneously usurping Alligare's business opportunity to promote the interests of the Ferrovia/Ferrosafe Entities.

COMPLAINT - 16

C.  **Welsh uses deceitful business practices to pump Alligare's earnings and thereby inflate the price for ADAMA to buy out WHI's interest in Alligare.**

77.     Recall that, in addition to giving ADAMA a "Second Option" to acquire 100% of Alligare, the 2006 acquisition agreement also provided Welsh a "Put Option" to force ADAMA to acquire all of WHI's remaining equity in Alligare. The price for such a buyout—whether at ADAMA's option or Welsh's—was calculated, in part, based on Alligare's EBITDA for the two prior years. Starting in 2018, Welsh began pressing Alligare's finance and accounting staff, including Gardner, to push sales into Q4 of the fiscal year so as to increase the revenues realized in that period. He did this, he said, to ensure that he would have two "good years" within the applicable EBITDA period so he could "get out" at a higher price when exercising his Put Option.

78.     In Q4 of fiscal year 2018 ("FY18"), Welsh and Gardner caused Ferrovia to order approximately $5.3 million of products from Alligare, bringing Ferrovia's total purchases for FY18 to approximately $17 million—a 50% increase over the prior year's sales to Ferrovia. On information and belief, these figures were misleading and inflated because Ferrovia did not actually require the volume of products it purchased, but rather purchased at such levels to increase the revenue figure used to calculate the price for any buyout of WHI; and because Alligare and ADAMA were unaware that Welsh and Gardner were on both sides of the transactions that generated this revenue. Plaintiffs' information and belief in this regard are based on the following facts:

a.     In Q1 of fiscal year 2019 ("FY19), Ferrovia returned approximately $1.8 million worth of products;

b.     Ferrovia's orders for FY19 were a fraction of the volume from FY18, given that Ferrovia had over-bought its requirements during the previous fiscal year;

c.     Welsh and Gardner never revealed to Alligare or ADAMA that they were involved with the Ferrovia/Ferrosafe Entities;

d.     While attending Alligare's board meeting in April 2018, Welsh stated that 2018 would likely be his last year at Alligare, after which he planned to "get out"; and

COMPLAINT - 17

e.     Welsh had told others on other occasions that he needed the revenue figures to be high so he could "get out" following some "good years."

79.     For some time, a dispute had been brewing between Welsh and the other board members over calculation of Welsh's LLC dividend from Alligare. At a board meeting in February 2019, these tensions degenerated into Welsh shouting at various members of the board. Following this outburst, the board concluded the meeting and then told Welsh that ADAMA planned to exercise its Second Option under the 2006 acquisition agreement and purchase all of WHI's interest in Alligare.

80.     Like the Put Option buyout price, the Second Option price was also based on Alligare's EBITDA. Welsh and Gardner's tactic of over-buying for Ferrovia in the last quarter of FY18 (the "Purchase-Loading Scheme") boosted Alligare's 2018 EBITDA and inflated the price ADAMA would need to pay to acquire WHI's 20% stake in Alligare.

81.     On April 15, 2019, ADAMA, Alligare, and WHI entered a Membership Interest Purchase Agreement ("MIPA"). Members of ADAMA's board—two of whom also sat on Alligare's board of managers—approved the MIPA and related agreements in an Action by Written Consent of Directors dated April 15, 2019, which they signed while located in Florida. Under the MIPA, ADAMA paid WHI $5.3 million for WHI's equity in Alligare. WHI agreed to withdraw as a member of Alligare, and Welsh agreed to resign from Alligare's manager board. In addition, as part of this buyout transaction, Alligare declared a $3.75 million dividend, of which WHI, as 20% owner, received nearly $750,000.

82.     Once again providing legal services despite owing tangled duties of loyalty to various adverse parties, Harwell represented Welsh and WHI in connection with the MIPA.

83.     As mentioned, after the buyout occurred, Ferrovia sharply decreased its buying from Alligare to compensate for the fact that it had purchased its requirements earlier than it otherwise would have so as to temporarily boost Alligare's revenue. Through this scheme, ADAMA overpaid for WHI's equity in Alligare by approximately $400,000, and Alligare paid WHI a dividend inflated by about $80,000.

COMPLAINT - 18

**D.**   **Welsh solicits Gardner, Zoost, and Cammack to join him in working at the Ferrovia/Ferrosafe entities.**

84.   WHI withdrew as a member of Alligare and Welsh resigned from the board. His employment as President also terminated upon receipt of his last paycheck.[5]

85.   In May 2019, less than a month after leaving Alligare, Plaintiffs are informed and believe that Welsh—whose involvement with the Ferrovia/Ferrosafe entities was still secret—formally became Chairman of Ferrovia.

86.   Plaintiffs are informed and believe that Welsh—in violation of his obligations under the Employment Contract—then successfully solicited Defendants Cammack (involved with the Ferrovia/Ferrosafe Entities since 2016) and Zoost to leave their employment with Alligare and to work for the Ferrovia/Ferrosafe Entities. In particular, Zoost now works for Ferrosafe, and Cammack works for Ferrovia.

87.   Around the time that ADAMA informed Welsh it would trigger the option to acquire all of Alligare, Plaintiffs are informed and believe that, during an evening of drinking, an intoxicated Welsh boasted that in fact he had long been involved with the Ferrovia/Ferrosafe Entities.

88.   He repeated his mantra that Plaintiffs could "come after him" if they wanted but he would win because "this is Lee County, Alabama," and he knew many of the judges. The true scope of Defendants' misconduct came into sharper focus for Plaintiffs in January 2020 after rumors of Welsh's drunken comments reached Alligare and ADAMA leadership.

89.   On February 4, 2020, Gardner resigned from Alligare and went to work for the Ferrovia/Ferrosafe Entities—for which he had already served as CFO beginning in mid-2016. On information and belief, he timed his departure from Alligare to get out before his duplicity was discovered.

---

[5] The Employment Agreement states that its term will continue until December 31, 2016, but that, if Welsh continues working as President without a new employment contract or an amendment to the existing one, his employment as President would "continue on an at-will basis until terminated either party."

K&L GATES LLP
200 SOUTH BISCAYNE BLVD, # 3900
MIAMI, FLORIDA, 33131-2399
TELEPHONE: (305) 539-3300

**E.**   **Statement of grounds for Plaintiffs' information and belief regarding affiliations among certain Defendants.**

90.   The following paragraphs 90–102 set forth Plaintiffs' understanding, information, and belief as to affiliations among the Ferrovia/Ferrosafe Entities; and between those entities and the Individual Defendants other than Hayley Welsh.

91.   LLCs are designed in part protect their owners' privacy. Only a fee, a registered address, and short filing are required to form one in most states, and members' identities are generally private.

92.   Details of Defendants' relationships to the Ferrovia/Ferrosafe Entities are thus in Defendants' sole control. Plaintiffs have gleaned the following from what little is public.

**1.   The Ferrovia/Ferrosafe Entities are under common control or ownership.**

93.   Although RSI publicly states it has changed its name to Ferrosafe, RSI continues to exist as an active Washington corporation.

94.   On information and belief, "Ferrosafe" comprises Defendants Ferrosafe and Ferrosafe Holdings. Ferrosafe was initially formed as a Mississippi LLC in 2013. Plaintiffs are informed and believe that an Arizona LLC formed in December 2015 became its successor entity. Ferrosafe Holdings was also formed as an Arizona LLC in December 2015.

95.   Ferrovia formed in Delaware in late 2016.

96.   All of the Ferrovia/Ferrosafe Entities—RSI, Ferrosafe, Ferrosafe Holdings, and Ferrovia—are affiliated, i.e., they control, are controlled by, or are under common control with each other. Plaintiffs base this on the following:

a.   Ferrosafe's regulatory filings in Arizona indicate that its sole member is Ferrosafe Holdings. *See* Ex. A.

b.   Ferrosafe Holdings' filings in Arizona indicate that its members include RSI and the since-dissolved Mississippi Ferrosafe entity. *See* Ex. B.

c.   Ferrovia's foreign LLC annual report filed in Oregon indicates that Ferrosafe Holdings is a member of Ferrovia. *See* Ex. C.

COMPLAINT - 20

d.      Ferrosafe and Ferrosafe Holdings filed papers in Arizona that contain power-of-attorney forms in which Ferrovia authorized people to sign documents on behalf of Ferrovia and its "subsidiary entities." *See* Exs. D, E.

### 2. Welsh, Blythe, Harwell, Gardner, Cammack and Zoost have pecuniary interests in the Ferrovia/Ferrosafe Entities.

97.     No later than 2014, Harwell was an officer of the Ferrosafe Mississippi entity.

98.     No later than March 2015, Welsh and Harwell became directors of RSI.

99.     No later than May 2016, Welsh, Gardner, and Defendant Ryan Cammack became managers or members of Ferrosafe; and Gardner became CFO of Ferrosafe and Ferrosafe Holdings.

100.     No later than 2017, Mark Gardner became CFO of Ferrovia, and Defendant W. Allen Blythe became a governing person of RSI.

101.     Defendant Matt Zoost is a director, manager, officer, agent, or owner of Ferrosafe.

102.     Plaintiffs base these allegations on the following information:

a.      Harwell and his wife Kristen Harwell are listed as officers of Ferrosafe in 2014 and 2015 annual reports filed in Mississippi, with Harwell listed as the "Organizer," and Kristen Harwell listed as the "Manager." Exs. F, G.

b.      Welsh and Harwell are listed as directors of RSI in an annual report filed in Washington State in March 2015. *See* Ex. H.[6]

c.      Mark Gardner signed the March 2017 power-of-attorney form mentioned above as CFO of Ferrovia and submitted it with Ferrosafe's and Ferrosafe Holdings' Arizona filings. *See* Exs. D, E.

d.      Ferrosafe's initial foreign LLC report filed in May 2016 in Washington State lists Welsh, Gardner, and Cammack, as "Members or Managers" of Ferrosafe. Ex. I.

---

[6] As of 2016, Welsh and Harwell no longer appear on RSI's annual reports. Plaintiffs have no information suggesting, and thus do not believe or allege, that Harwell or Welsh ended their affiliation with RSI.

K&L GATES LLP
200 SOUTH BISCAYNE BLVD, # 3900
MIAMI, FLORIDA, 33131-2399
TELEPHONE: (305) 539-3300

> e.     On RSI's most recent Washington State annual report, Blythe is listed as a governing person of RSI. *See* Ex. J.

> f.     An archived version of the Ferrosafe website from August 2018, which has since been taken down, indicates that Gardner is the CFO of Ferrosafe. *See* Ex. K.

> g.     Defendant Matt Zoost is listed on the Ferrosafe Website as Ferrosafe's public point of contact, and Cammack is listed in the same capacity on Ferrovia's website. *See* Exs. L, M.

## V.     CAUSES OF ACTION

**COUNT I** - Securities fraud - Section 10(b) of the Securities Act of 1933 & Rule 10b-5
(ADAMA against Jeff and Hayley Welsh, WHI, Mark Gardner, and Bo Harwell)

103.   Plaintiffs incorporate the above paragraphs 1–102, including subparagraphs, as if set forth in this paragraph.

104.   WHI; Hayley Welsh as a controlling person; Jeff Welsh, directly and as a controlling person; Gardner; and Harwell are liable for securities fraud in connection with ADAMA's acquisition of Alligare in 2019.

105.   Under the MIPA and related transfer agreement, ADAMA bought Alligare LLC membership units that are "securities" under federal law. 15 U.S.C. § 78c(a)(10).

106.   In connection with this purchase and sale, WHI and Jeff Welsh omitted to state the following material facts that where necessary to make the other statements made not misleading in light of the surrounding circumstances, in violation of 17 C.F.R. § 240.10b-5(b):

> a.     That Welsh had caused Ferrovia to purchase in 2018 products it otherwise would not have bought until 2019 via the Purchase-Loading Scheme, resulting in the temporary inflation of Alligare's EBITDA and, consequently, the purchase price of WHI's interest;

> b.     That, as of early 2019, Ferrovia had begun and would continue to sharply reduce the volumes of products purchased from Alligare, having purchased in 2018 products it otherwise would have purchased in 2019.

COMPLAINT - 22

c. That, as a result, the $5.3 million ADAMA paid for WHI's interest in Alligare was not a fair price; and

d. That Welsh, Gardner, and Harwell had a pecuniary interest in the Ferrovia/Ferrosafe Entities, whose purchases generated revenue used to calculate WHI's buyout price. This was a material piece of nonpublic information that, if revealed, would have lowered WHI's buyout price due to Welsh's divided loyalties, potentially exposed the Purchase-Loading Scheme, and allowed ADAMA to better negotiate the terms on which it would acquire WHI's interest in Alligare.

107. In connection with this purchase and sale, Harwell, Welsh, and Gardner employed a device, scheme, or artifice to defraud in violation of 17 C.F.R. § 240.10b-5(a) by implementing the Purchase-Loading Scheme to misleadingly pump WHI's buyout price while concealing their pecuniary interests and involvement in the Ferrovia/Ferrosafe Entities.

108. Harwell, Welsh, WHI, and Gardner used the mails, the wires, and other means of communications in interstate commerce to make these statements and omissions and to advance their fraudulent scheme. In particular, they sent agreement drafts and related communications by email, discussed the same over phone calls, and sent purchase orders and invoices with Ferrovia through the wires.

109. Harwell, Welsh, WHI, and Gardner knew these statements and omissions were untrue or misleading and they intended for ADAMA to rely on them, as demonstrated by the following:

a. They were motivated to induce ADAMA to pay as much as possible for WHI's equity both to enrich the Welshes and to best situate themselves to exploit the Railroad Services Contract and Software through the Ferrovia/Ferrosafe Entities.

b. They were motivated to conceal their pecuniary interests in and involvement with the Ferrovia/Ferrosafe Entities to prevent ADAMA from securing separate counsel to represent Alligare in the buyout; demand better or different terms for the MIPA and for

COMPLAINT - 23

calculation of WHI's buyout price; or take action to address Harwell's, Welsh's, WHI's, and Gardner's corporate and professional breaches of fiduciary duties and trust.

c.    WHI, Welsh, Harwell, and Gardner had the opportunity to make these misleading untrue statements and omissions, and to employ the above scheme or artifice to defraud, by virtue of (i) Harwell's representation of Welsh and WHI in connection with the MIPA; (ii) Gardner's access to and knowledge and control of Alligare's finances to execute the Purchase-Loading Scheme; (iii) WHI's and Harwell's participation in drafting the MIPA; (iv) Welsh, Harwell, and Gardner's involvement in the Ferrovia/Ferrosafe Entities; and (v) their possession of the material nonpublic information described above.

d.    Welsh's boasting that he was not worried Plaintiffs might "come after him" indicates consciousness as to his own wrongdoing.

e.    Welsh urged Alligare's personnel help him boost sales numbers so he could have "good years" to boost the price for a buyout of WHI's equity in Alligare.

f.    Welsh learned at a February 2019 board meeting that ADAMA was forcing him out; Ferrovia's net purchases from Alligare for Q1 and Q2 of FY19 dropped by nearly 98% from that same period the year prior; and Ferrovia's total net purchases for FY19 dropped over 60% from its total net purchases for FY18.

g.    Welsh falsely told Alligare employees that ADAMA's in-house counsel was aware of Welsh's involvement with the Ferrovia/Ferrosafe entities and had approved the arrangement; and

h.    Welsh was, on information and belief, motivated by enmity toward ADAMA, which he viewed as a group of outsiders that had taken over his company, Alligare. This information and belief is based on Welsh's comments about ADAMA and Alligare's management, whom he described as "Jews," as detailed herein.

110.    This information was material in that ADAMA relied on it to acquire further equity in Alligare. Had ADAMA known the truth, it would have taken action to enforce these Defendants' fiduciary duties, would have paid less to buy out WHI, would have fired Harwell, and would have

K&L GATES LLP
200 SOUTH BISCAYNE BLVD., # 3900
MIAMI, FLORIDA, 33131-2399
TELEPHONE: (305) 539-3300

required more stringent representations, warranties, assurances, and indemnities from WHI in the MIPA.

111.    This conduct proximately caused ADAMA to overpay WHI for equity in Alligare that was worth less than represented.

112.    As a result, Plaintiffs suffered damages in an amount to be proven at trial.

113.    In addition, Jeff Welsh and Hayley Welsh are liable under Section 20(a) of the Securities Exchange Act (15 U.S.C. § 78t) as controlling persons of WHI.

**COUNT II** - Common law fraud
(Alligare against Welsh and the Ferrovia/Ferrosafe Entities)

114.    Plaintiffs incorporate the above paragraphs 1–102, including subparagraphs, as if set forth in this paragraph.

115.    Beginning no later than May 2016, Welsh acted at all material times as both President of Alligare and as an agent of the Ferrovia/Ferrosafe Entities. As President of Alligare, Welsh had an affirmative duty to disclose and not to conceal certain material facts.

116.    Welsh, acting both as President of Alligare and as an agent of the Ferrovia/Ferrosafe Entities, made the following false statements of material fact and concealed the following material facts which he had a duty to disclose:

a.    Welsh told Alligare's board that the market for application services in the railway sector had changed and would no longer be profitable compared to what could be earned through a supposedly exclusive agreement with Ferrovia based on guaranteed pricing.

b.    Welsh falsely told Alligare's board, when presenting ADAMA's general counsel with a draft of the Assignment, that the Railroad Services Contract was no longer desirable or profitable for Alligare because Alligare could secure a better arrangement through guaranteed pricing on exclusive sales to Ferrovia. In fact, the Ferrovia/Ferrosafe Entities organized an entire M&A transaction based on the profitability of the Railroad Services Contract; and Ferrovia was not offering the guaranteed pricing that Welsh represented to Alligare was being offered.

COMPLAINT - 25

c.      The version of the Assignment Welsh presented to the board omitted the provisions (i) transferring the Software to Ferrovia, and (ii) allowing Ferrovia to escape exclusive purchase and guaranteed pricing obligations if it could obtain more favorable pricing from other suppliers.

d.      Welsh never revealed the fact that he had pecuniary and/or ownership interests on both sides of the Assignment transaction.

e.      Welsh falsely told Alligare employees that ADAMA's in-house counsel was aware of Welsh's involvement with the Ferrovia/Ferrosafe entities and had approved the arrangement.

f.      Welsh worked to make Alligare's dealings with the Ferrovia/Ferrosafe Entities appear to be at an arm's length and he allowed and encouraged Alligare to believe this.

117.    These misrepresentations and acts of concealment were material. Had Alligare known the truth, it would have stopped the Assignment, kept the Railroad Services Contract, ousted Welsh and his people from the company, acted to preserve the Software, and filed suit far sooner against Welsh, Harwell, and the Ferrovia/Ferrosafe Entities.

118.    Alligare's reliance on the completeness and accuracy of Welsh's assertions and its resulting inaction to stop his misconduct was reasonable given that Welsh actively concealed the nature of his true loyalties and that the Assignment involved transferring the Software and less favorable pricing terms than represented.

119.    As a result of this fraudulent conduct, Alligare is entitled to damages in an amount to be proven at trial.

<u>**COUNT III**</u> - Tortious interference with contractual relations
(Alligare against the Ferrovia/Ferrosafe Entities)

120.    Plaintiffs incorporate the above paragraphs 1–102, including subparagraphs, as if set forth in this paragraph.

121.    The Ferrovia/Ferrosafe Entities were aware that Alligare was a party to the Railroad Services Contract.

COMPLAINT - 26

122.     The Ferrovia/Ferrosafe Entities intentionally interfered with that contract by fraudulently inducing Alligare to assign it to them and by obtaining Company A's consent for the assignment.

123.     This interference was improper and wrongful because as described above, it involved deceit in an effort to make a collusive transaction appear to be an arm's length transaction as well as the concealment of material contract terms, namely the transfer of the Software and the modification of the pricing and exclusivity terms. In addition, it was motivated by Welsh's enmity toward ADAMA.

124.     The Ferrovia/Ferrosafe Entities were also aware that Alligare was party to employment agreements, whether written or otherwise, with Blythe, Cammack, Gardner, Chris Bryan, and Chris Wilburn.

125.     The Ferrovia/Ferrosafe Entities intentionally induced these employees to terminate their employment agreements with Alligare.

126.     This intentional interference was improper and wrongful because it was independently tortious in that the Ferrovia/Ferrosafe Entities fraudulently concealed their involvement with rogue Alligare insiders and also induced at least some of these employees to commit not just contractual breaches but violations of independent fiduciary duties existing under the law of agency.

127.     As a factual and proximate result of these acts, Alligare suffered damages in an amount to be proven at trial.

### **COUNT IV** - Breach of the Employment Contract
(Alligare against Jeff Welsh)

128.     Plaintiffs incorporate the above paragraphs 1–102, including subparagraphs, as if set forth in this paragraph.

129.     Welsh and Alligare were parties to a valid Employment Contract dated June 26, 2012, which remained in effect as at-will employment until Welsh left in April 2019.

COMPLAINT - 27

130.    The Employment Contract defines "Restricted Period" as a period ending two years after termination of the Employment Contract. It further provides:

> During the Employment Period and the Restricted Period . . . Executive shall not, **directly or indirectly**, as a principal, director, officer, partner, . . . agent[,] or in any other capacity, solicit, advise[,] or induce any officer director, employee, [or] agent . . . of the Company . . . to leave his or her employment . . . with the Company . . . . [Nor shall] Executive . . . directly or indirectly, solicit, advise[,] or induce any person or entity . . . that, on the effective date of termination of Executive's employment with the Company, Executive knows is . . . or was . . . within one (1) year prior . . . a client or customer of the Company, to withdraw, curtail, modify, or cancel its business or relationship with Company.

Emp't Contract § 8. The mere act of solicitation violates the provision. The solicited person need not actually end his employment or curtail, modify, or cancel a relationship with Alligare.

131.    Welsh violated this provision by doing the following:

a.      On information and belief, soliciting and inducing, directly or through one or more intermediaries, the following employees to leave Alligare and join the Ferrovia/Ferrosafe Entities in or around March through May 2017: Blythe, Cammack, Chris Bryan, and Chris Wilburn;

b.      Inducing Company A to modify and cancel its business relationship with Alligare by consenting to the assignment to Ferrovia of the Railroad Services Contract; and

c.      Inducing Ferrovia to modify and curtail its relationship with Alligare by causing it to return and to be refunded for the purchase of $1.8 million in products it had purchased in FY18, and to sharply reduce Ferrovia's subsequent purchasing volumes from Alligare.

132.    The Employment Contract further provides:

> During the Employment Period and the Restricted Period . . . Executive shall not: (i) engage, anywhere within the Territory, as an officer, director or in any other managerial capacity; as an owner, co-owner or other investor or creditor; or as an employee, independent contractor, consultant or advisor, in any business selling **or** providing any goods or services within the Markets in competition with the Company; or (ii) call on any person . . . in the Territory that, on the effective date of termination of Executive's employment with the Company, Executive knows is . . . or was . . . within one (1) year prior . . . a customer of the Company, either for the purpose of soliciting or selling a product or service within the Markets which are sold or offered by the Company within the Markets at such time, or for a purpose which is otherwise in direct competition with the Company; *provided*,

K&L GATES LLP
200 SOUTH BISCAYNE BLVD, # 3900
MIAMI, FLORIDA, 33131-2399
TELEPHONE: (305) 539-3300

*however*, that nothing in this Section 10 shall prohibit Executive from owning, directly or indirectly, solely as an investment, securities of any entity traded on any national securities exchange or over-the-counter market . . . . [if Executive does not directly or indirectly control the entity or own more than 1% of any class of its securities].

*Id.* § 10(b) (italics original). "Territory" is the United States, *id.* § 10(a)(iii); and "Markets" means "the United States' markets for non-crop uses of agrochemical products as follows . . . (4) 'Vegetation Management Market' – market for pesticides for the control of pests on roadsides, railroads[,] and bare ground areas." Alligare LLC Op. Agreement § 1.2 (cited in Emp't Contract § 10(c)(iii)).[7]

133.    Welsh violated this provision by doing the following:

a.    Becoming chairman of Ferrovia less than a month after leaving Alligare;

b.    Becoming a member or manager of Ferrosafe no later than May 2016;

c.    In or around May of 2016, founding, or inducing or participating in the founding of, and on information and belief owning an equity interest in, the company Novita Solutions LLC, which describes itself as "a leading premium agri-chemical manufacturer providing solutions to many diversified industries nationwide"; and

d.    Becoming a director of RSI no later than March 2015.

134.    Welsh's breaches proximately caused Alligare to suffer damages in an amount to be proven at trial.

135.    Additionally, Alligare is entitled—without proof of actual damages—to injunctive relief restraining Welsh's continued violation of the non-solicitation and non-competition provisions as authorized in § 11 of the Employment Contract.

//

//

---

[7] "Markets" also include: "(1) Forestry Market – market for pesticides on forest land, these applications are made for site preparation and pest control; (2) 'Range and Pasture Market' market for pesticides for the control of weeds in range and pasture lands; [and] (3) 'Aquatic Weed Control Market' - market for pesticides for aquatic weed control in bodies of water . . . ." LLC Op. Agreement § 1.2 (punctuation original).

K&L GATES LLP
200 SOUTH BISCAYNE BLVD, # 3900
MIAMI, FLORIDA, 33131-2399
TELEPHONE: (305) 539-3300

**COUNT V** - Breach of fiduciary duty

(Alligare against Welsh, Gardner, Cammack, Blythe and Zoost)

136.    Plaintiffs incorporate the above paragraphs 1–102, including subparagraphs, as if set forth in this paragraph.

137.    As Alligare's President, Welsh owed Alligare a fiduciary duty to act with care, loyalty, and in observance of Alligare's interests over his own.

138.    Welsh breached these duties by, among other things:

a.    Misrepresenting the state of the railway pesticide application market, the pricing terms available from Ferrovia, and, consequently, the desirability of remaining in the Railroad Services Contract rather than assigning it;

b.    Inducing, utilizing and directing Alligare's outside counsel, Harwell, to serve his personal interests;

c.    Founding, investing in, and providing information, services, and working time to, the Ferrovia/Ferrosafe Entities;

d.    Transferring the Railroad Services Contract, related subcontracts, and the Software to the Ferrovia/Ferrosafe Entities;

e.    Concealing material terms that appeared in the final version of the Assignment;

f.    Falsely telling Alligare employees that ADAMA's in-house counsel was aware of Welsh's involvement with the Ferrovia/Ferrosafe entities and had approved the arrangement;

g.    Concealing and not revealing information regarding his involvement with the Ferrovia/Ferrosafe Entities;

h.    Creating—through temperamental outbursts, abusive language, and combative and confrontational interactions—an environment where Alligare's line employees felt unable to reveal Welsh's misconduct to the board without risking reprisal from him; and

i.    Doing the acts described in ¶¶ 131.a–c, 133.a–d.

COMPLAINT - 30

139.     As officers and employees of Alligare, Gardner, Cammack, Blythe, and Zoost owed Alligare fiduciary duties of loyalty and to act with reasonable care, prudence, and in furtherance of Alligare's best interests over their own interests.

140.     Gardner, Cammack, Blythe, and Zoost breached these duties by acceding to, encouraging, and inviting Welsh's solicitations to participate and invest in and work for the competing Ferrovia/Ferrosafe venture; and concealing or not revealing that they did so.

141.     In addition, Gardner breached these duties by representing Alligare in connection with disputes over amounts properly payable on invoices issued to Ferrovia, in which Gardner had a pecuniary interest. On information and belief, Gardner caused Alligare to settle these disputes on terms unduly favorable to Ferrovia at Alligare's expense.

142.     As a proximate result of these tortious acts, Alligare suffered damages in an amount to be proven at trial.

### COUNT VI - Professional malpractice, breach of fiduciary duty
(Alligare against Harwell)

143.     Plaintiffs incorporate the above paragraphs 1–102, including subparagraphs, as if set forth in this paragraph.

144.     As its counsel, Harwell owed Alligare a fiduciary duty that required him to act with care, loyalty, and to place its interests above his own. This included the following duties:

a.     Not representing clients whose interests are directly adverse to one another, or as to whom the lawyer's responsibilities would materially limit the lawyer's representation. *See, e.g.*, ABA Model R. of Prof'l Conduct (MRPC) 1.7(a)(1)–(2).

b.     Not representing clients as to whom the lawyer's personal interests, including family relationships, would materially limit the lawyer's representation. *See, e.g.*, MRPC 1.7(a)(1)–(2), cmt. 11.

c.     Not entering business transactions where the lawyer acquires a pecuniary interest adverse to the client. *See, e.g.*, MRPC 1.8(a).

COMPLAINT - 31

d.      Reporting to the leadership of an organizational client when the lawyer knows that an officer or employee is engaged in conduct that violates legal duties to the organization or that is unlawful. *See, e.g.*, MRPC 1.13(a)–(b).

e.      Returning client files and papers upon terminating representation of a client. *See, e.g.*, MRPC 1.16(d).

145.    Harwell breached these duties to Alligare by doing the following:

a.      Representing Alligare as outside general counsel despite also representing and continuing to represent WHI and Welsh in transactions adverse to Alligare.

b.      Representing Alligare as outside general counsel despite also representing and continuing to represent Welsh in connection with Welsh's Employment Contract with Alligare.

c.      Representing Alligare in transactions adverse to the Ferrovia/Ferrosafe Entities, to which Plaintiffs are informed and believe that Harwell also provided legal counsel.

d.      Acquiring a pecuniary interest in the Ferrovia/Ferrosafe entities as a director, part owner, officer, or otherwise.

e.      Failing to report to Alligare's board that the Welshes had committed securities fraud in connection with the MIPA.

f.      Failing to report to Alligare's board that Welsh had violated his fiduciary duties to Alligare as President due to his involvement with the Ferrovia/Ferrosafe entities.

g.      Failing to surrender Alligare's client file upon ending the representation.

146.    Plaintiffs are informed and believe that (i) Harwell never obtained any written waivers of conflicts of interest; (ii) any waivers obtained were not the product of informed consent; (iii) any waivers obtained were signed by Welsh who could not provide consent; or (iv) the conflicts at issue were not the type of conflicts that are waivable.

147.    As a proximate result of these acts, Alligare suffered damages in an amount to be proven at trial.

K&L GATES LLP
200 SOUTH BISCAYNE BLVD, # 3900
MIAMI, FLORIDA, 33131-2399
TELEPHONE: (305) 539-3300



**Harwell's conflicted loyalties**

<u>**COUNT VII**</u> - Violation of the Defend Trade Secrets Act (18 U.S.C. § 1831 et seq.)
(Alligare against Welsh, Cammack, and Ferrovia)

148.    Plaintiffs incorporate the above paragraphs 1–102, including subparagraphs, as if set forth in this paragraph.

149.    The Defend Trade Secrets Act ("DTSA") confers a federal private cause of action on "an owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

150.    Prior to Ferrovia and Welsh's misappropriation of the Software, Alligare was the owner of trade secrets relating to, *inter alia*, solutions for managing, supplying, overseeing, and monitoring the results of, the ordering, sale, invoicing, and use of vegetation management products. These trade secrets comprise unique compilations of information embodied in the Software and its associated source code. The Software contained detailed information and data regarding Alligare's customers, products, and sales, compiled and organized over a 5-year period.

COMPLAINT - 33

K&L GATES LLP
200 SOUTH BISCAYNE BLVD, # 3900
MIAMI, FLORIDA, 33131-2399
TELEPHONE: (305) 539-3300

151.    The trade secrets embodied in the Software are crucial to the success of Alligare's business of sourcing, selling, and managing the application of, vegetation management products. In particular, one key market advantage that Alligare had—before misappropriation of its trade secrets—was information regarding its customers, including information related to customer order histories, order volume, preferences, timing, shipping, project parameters and results, and inventory.

152.    These trade secrets were of significant value to Alligare, because they allowed Alligare to know, to track, and to generate estimates of which customers needed how much of what products for what purposes and when; as well as how best to meet those demands, and the results Alligare's customers experienced when using its products. This specific compilation of information was only possible through the expenditure of considerable funds and through great effort over a five year period during which Alligare worked with a third party to compile Alligare's data, records, and customer information into the specific configuration comprising the trade secrets as contained in the Software.

153.    At all times, Alligare has taken reasonable efforts to maintain the secrecy of its trade secrets via the use of nondisclosure and/or confidentiality agreements, employment agreements, employee training, and other measures. For example, before Welsh and Ferrovia misappropriated it, Alligare controlled access to the Software via password protection. In addition, the Railroad Services Contract contains a robust confidentiality clause specifically designating the Software as confidential information. Likewise, the Employment Agreement's confidentiality provision covers the trade secrets embodied in the Software, and the Assignment (although procured by wrongful means) contains a confidentiality provision that encompasses the terms of the Assignment itself, including the Assignment's references to and discussion of the Software.

154.    These trade secrets relate to a product or service used in interstate commerce, namely Alligare's sale of vegetation management products to, and management of and subcontracting with, applicators and customers across the United States.

COMPLAINT - 34

155.     Ferrovia acquired the trade secrets contained in the Software via the fraudulently induced Assignment. Ferrovia knew or had reason to know that these trade secrets were acquired by improper means due to Welsh's transmission of these trade secrets to Ferrovia via the Assignment, which he deceived Alligare into approving using misleading statements and an incomplete draft as described above; as well as Harwell's breach of fiduciary duty by serving interests on both sides of the Assignment transaction.

156.     In addition Ferrovia disclosed these trade secrets to its employees, including Cammack, to whom it granted access to and use of the Software. On information and belief, Cammack knew that Welsh was involved in both Alligare and Ferrovia, and thus knew or should have known that improper means were or must have been used to acquire the Software.

157.     As a proximate result of Ferrovia's, Welsh's, and Cammack's misappropriation, Alligare is entitled to damages under 18 U.S.C. § 1836(b)(3)(B) in an amount to be proven at trial.

158.     Based on the same facts alleged in this complaint that demonstrate scienter or other requisite mental states for purposes of Plaintiffs' claims for fraud, securities fraud, tortious interference, and breaches of fiduciary duties, Ferrovia's, Welsh's, and Cammack's misappropriation of the Software was willful and malicious under 18 U.S.C. § 1836(b)(3)(C) and Alligare is thus entitled to two times the amount of any damages awarded under § 1836(b)(3)(B), as well as an award of attorney's fees as authorized by § 1836(b)(3)(D).

### COUNT VIII - Breach of Contract
(Alligare against Ferrovia)

159.     Plaintiffs incorporate the above paragraphs 1–102, including subparagraphs, as if set forth in this paragraph.

160.     As mentioned, the Assignment required Ferrovia to purchase products exclusively from Alligare, which Alligare was told would be subject to guaranteed pricing levels. However, given the significant reduction in Ferrovia's purchase volumes as described above, on information and belief, Ferrovia has purchased and continues to purchase products from competing suppliers in violation of its purported exclusivity provisions.

K&L GATES LLP
200 SOUTH BISCAYNE BLVD, # 3900
MIAMI, FLORIDA, 33131-2399
TELEPHONE: (305) 539-3300

161.    Likewise, Ferrovia returned $1.8 million worth of products it had purchased; but there was no good faith basis for Ferrovia to do so. Rather, Ferrovia returned these products because of its participation in the Purchase-Loading Scheme to assist in WHI's commission of securities fraud as described above, in violation of its duty to perform the Assignment in good faith.

162.    As a result, Ferrovia breached the Assignment and related purchase orders.

163.    Thus, Alligare is entitled to an award of damages in an amount to be proven at trial.

## VI.    PRAYER FOR RELIEF

Plaintiffs pray for the following relief:

A.    Disregard of the corporate separation among the Ferrovia/Ferrosafe Entities, and between Welsh and WHI as necessary to prevent injustice and abuse of the corporate form;

B.    Compensatory and punitive damages to the extent permitted under state and federal law;

C.    An award of double damages under the Defend Trade Secrets Act;

D.    An award of attorneys' fees to the extent allowed by applicable law or contract;

E.    An award of prejudgment interest; and

F.    Such further relief as the Court determines that justice requires.

DATED: May 5, 2020

K&L GATES LLP

By:   /s/ *William J. Simonitsch*
William J. Simonistch, Florida Bar. # 422060
200 S. Biscayne Blvd., Suite 3900
Miami, FL 33131-2370
Tel: 305-539-3300
Fax: 305-358-7095
bill.simonitsch@klgates.com

Philip M. Guess, Wash. State Bar # 26765

K&L GATES LLP
200 SOUTH BISCAYNE BLVD, # 3900
MIAMI, FLORIDA, 33131-2399
TELEPHONE: (305) 539-3300

(to seek *pro hac vice* admission)
Daniel-Charles Wolf, Wash. State Bar # 48211
(to seek *pro hac vice* admission)
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Tel: 206-623-7580
Fax:  206-623-7022
philip.guess@klgates.com
dc.wolf@klgates.com

Elizabeth H. White, Cal. State Bar # 291439
(to seek *pro hac vice* admission)
One SW Columbia St., Suite 1900
Portland, OR 97204
Tel: 503-228-3200
Fax:  503-248-9085
elizabeth.white@klgates.com

Attorneys for Plaintiffs

COMPLAINT - 37

# EXHIBIT A

**FILED: 12/7/2015 3:50:43 PM**                    DOCUMENT # 05324706

**FILE #:  L20520783**

DO NOT WRITE ABOVE THIS LINE: RESERVED FOR ACC USE ONLY.

# ARTICLES OF ORGANIZATION

1.   **ENTITY TYPE:**   LIMITED LIABILITY COMPANY

2.   **ENTITY NAME:**   FERROSAFE, LLC

3.   **FILE NUMBER:**   L20520783

4.   **STATUTORY AGENT NAME AND ADDRESS:**

Street Address:                    Mailing Address:

JOHN RUMBLE

7280 NORTH GLEN HARBOR BOULEVARD

GLENDALE , AZ   85307

5.   **ARIZONA KNOWN PLACE OF BUSINESS ADDRESS:**

7280 NORTH GLEN HARBOR BOULEVARD

GLENDALE , AZ   85307

6.   **DURATION**:   Perpetual

7.   **MANAGEMENT STRUCTURE:    Member-Managed**

The names and addresses of all Members are:

1   **FERROSAFE HOLDINGS, LLC**

7280 N. GLEN HARBOUR BOULEVARD

GLENDALE, AZ   85307

8.   **EXPEDITE FEE:**      Yes

**ORGANIZER:**   John Rumble                    12/7/2015

EXHIBIT B

**FILED: 12/7/2015 3:40:03 PM**                                      DOCUMENT # 05324695

**FILE #: L20520681**

DO NOT WRITE ABOVE THIS LINE: RESERVED FOR ACC USE ONLY.

# ARTICLES OF ORGANIZATION

**1.   ENTITY TYPE:**   LIMITED LIABILITY COMPANY

**2.   ENTITY NAME:**   FERROSAFE HOLDINGS, LLC

**3.   FILE NUMBER:**   L20520681

**4.   STATUTORY AGENT NAME AND ADDRESS:**

Street Address:                              Mailing Address:

JOHN RUMBLE

7280 NORTH GLEN HARBOR BOULEVARD

GLENDALE , AZ   85307

**5.   ARIZONA KNOWN PLACE OF BUSINESS ADDRESS:**

7280 NORTH GLEN HARBOR BOULEVARD

GLENDALE , AZ   85307

**6.   DURATION:**   Perpetual

**7.   MANAGEMENT STRUCTURE:    Manager-Managed**

The names and addresses of all Managers are:

1   **JOHN RUMBLE**

7280 N. GLEN HARBOR BOULEVARD

GLENDALE, AZ   85307

The names and addresses of all Members are:

1   **RUMBLE SPRAY, INC.**                2   **FERROSAFE, LLC**

500 FIRST AVENUE                          1880 LAKELAND DRIVE, SUITE F

ZILLAH, WA   98953                        JACKSON, MS   39216

**8.   EXPEDITE FEE:**       Yes

**ORGANIZER:**   John Rumble _____   12/7/2015

# EXHIBIT C

Corporation Division
www.filinginoregon.com

**E-FILED**
Apr 19, 2019
**OREGON SECRETARY OF STATE**

**REGISTRY NUMBER**
132331497

**REGISTRATION DATE**
05/10/2017

**BUSINESS NAME**
FERROVIA SERVICES, LLC

**BUSINESS ACTIVITY**
RAILROAD VEGETATION MANAGEMENT

**MAILING ADDRESS**
1565 5TH AVE
OPELIKA AL 36801 USA

**TYPE**
FOREIGN LIMITED LIABILITY COMPANY

**PRIMARY PLACE OF BUSINESS**
1565 5TH AVE
OPELIKA AL 36801 USA

**JURISDICTION**
DELAWARE

**REGISTERED AGENT**
15872088 - CORPORATION SERVICE COMPANY

1127 BROADWAY ST NE STE 310
SALEM OR 97301 USA

If the Registered Agent has changed, the new agent has consented to the appointment.

**MEMBER**
FERROSAFE HOLDINGS, LLC

1565 5TH AVE
OPELIKA AL 36801 USA



Corporation Division
www.filinginoregon.com

**OREGON SECRETARY OF STATE**

I declare, under penalty of perjury, that this document does not fraudulently conceal, fraudulently obscure, fraudulently alter or otherwise misrepresent the identity of the person or any officers, managers, members or agents of the limited liability company on behalf of which the person signs. This filing has been examined by me and is, to the best of my knowledge and belief, true, correct, and complete. Making false statements in this document is against the law and may be penalized by fines, imprisonment, or both.

By typing my name in the electronic signature field, I am agreeing to conduct business electronically with the State of Oregon. I understand that transactions and/or signatures in records may not be denied legal effect solely because they are conducted, executed, or prepared in electronic form and that if a law requires a record or signature to be in writing, an electronic record or signature satisfies that requirement.

**ELECTRONIC SIGNATURE**

**NAME**

JENNY KATZ

**TITLE**

AUTHORIZED PERSON

**DATE SIGNED**

04-19-2019

EXHIBIT D

RECEIVED

MAY 0 9 2017

ARIZONA CORP. COMMISSION
CORPORATIONS DIVISION

AZ Corp. Commission

05888614

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

# LLC STATEMENT OF CHANGE
## OF KNOWN PLACE OF BUSINESS ADDRESS OR STATUTORY AGENT

*Read the Instructions L020i*

**NOTE** – *no matter what is being changed, numbers 1, 2, 3.1, 4.1, and 4.2 must be completed. The form will be rejected if those sections are not completed.*

1. **ENTITY NAME** – give the exact name of the LLC as currently shown in A.C.C. records:

   Ferrosafe, LLC

2. **A.C.C. FILE NUMBER:** L20520783

   Find the A.C.C. file number on the upper corner of filed documents OR on our website at: http://www.azcc.gov/Divisions/Corporations

| 3. | **ARIZONA KNOWN PLACE OF BUSINESS ADDRESS:** | | | | | |
|---|---|---|---|---|---|---|
| **3.1** *REQUIRED* – list the known place of business address currently shown in A.C.C. records (before any changes): | | | **3.2** *Optional* - List the NEW known place of business address in Arizona (must be a street or physical address): | | | |
| Attention (optional) | | | Attention (optional) | | | |
| 7280 North Glen Harbor Boulevard | | | | | | |
| Address 1 | | | Address 1 | | | |
| Address 2 (optional) | | | Address 2 (optional) | | | |
| City Glendale | AZ State | 85307 Zip | City | State | Zip | |

**3.3  If you completed 3.2**, is the NEW known place of business address in Arizona the same as the street address of the statutory agent?    ☐ Yes  ☐ No

4. **CURRENT OR EXISTING STATUTORY AGENT** – list the name and addresses of the statutory agent as shown in the records of the Arizona Corporation Commission *before any changes* (this is the existing statutory agent):

| **4.1** *REQUIRED* – list the **name** and **physical or street address** (not a P.O. Box) in Arizona of the existing statutory agent: | | | **4.2** *REQUIRED* – list the **mailing address** (if one exists in A.C.C. records) in Arizona of the existing Statutory Agent: | | |
|---|---|---|---|---|---|
| John Rumble | | | | | |
| Statutory Agent Name | | | | | |
| Attention (optional) | | | Attention (optional) | | |
| 7280 North Glen Harbor Boulevard | | | 7280 North Glen Harbor Boulevard | | |
| Address 1 | | | Address 1 | | |
| Address 2 (optional) | | | Address 2 (optional) | | |
| City Glendale | AZ State | 85307 Zip | City Glendale | AZ State | 85307 Zip |

L020.001
Rev: 2010

Arizona Corporation Commission – Corporations Division
Page 1 of 3

**4.3**  ☐  **CHANGE IN EXISTING STATUTORY AGENT NAME ONLY** – if the *name only* of the existing statutory agent listed in number 4.1 above has changed, but a new agent has not been appointed, check the box and give the new name of the existing statutory agent below:

_____

**4.4**  **CHANGE IN EXISTING STATUTORY AGENT ADDRESS** – check all that apply and follow instructions:

    ☐  **STREET ADDRESS CHANGED** – complete number 4.5.

    ☐  **MAILING ADDRESS CHANGED** – complete number 4.6.

| **4.5 NEW STREET ADDRESS** – give the NEW physical or street address (not a P.O. Box) in Arizona of the existing statutory agent: | | | **4.6 NEW MAILING ADDRESS** – give the NEW mailing address in Arizona of the existing statutory agent (can be a P.O. Box): | | |
|---|---|---|---|---|---|
| Attention (optional) | | | Attention (optional) | | |
| Address 1 | | | Address 1 | | |
| Address 2 (optional) | | | Address 2 (optional) | | |
| City | State | Zip | City | State | Zip |

| **5.** ☒ **NEW STATUTORY AGENT** – if a new statutory agent is being appointed, check the box and complete the following for the **NEW statutory agent**: | | | | | |
|---|---|---|---|---|---|
| **5.1** *REQUIRED* – give the name (can be an individual or an entity) and physical or street address (not a P.O. Box) in Arizona of the NEW statutory agent: | | | **5.2** *OPTIONAL* – mailing address in Arizona of NEW Statutory Agent (can be a P.O. Box): | | |
| Corporation Service Company | | | | | |
| Statutory Agent Name | | | | | |
| Attention (optional) | | | Attention (optional) | | |
| 2338 W. Royal Palm Road, Suite J | | | 2338 W. Royal Palm Road, Suite J | | |
| Address 1 | | | Address 1 | | |
| Address 2 (optional) | | | Address 2 (optional) | | |
| City Phoenix | AZ State | 85021 Zip | City Phoenix | AZ State | 85021 Zip |
| **5.3** *REQUIRED* – if you are appointing a new statutory agent, the <u>Statutory Agent Acceptance</u> form M002 must be submitted along with this Statement of Change form. | | | | | |

**SIGNATURE** – *see Instructions L020i for who is authorized to make changes:*

If the person signing this form is the existing statutory agent changing its own address, then by the signature appearing below, the existing statutory agent certifies *under penalty of perjury* that he or she has given the LLC named in number 1 above written notice of the address change.

By checking the box marked "I accept" below, I acknowledge *under penalty of perjury* that this document together with any attachments is submitted in compliance with Arizona law.

 

☒ I ACCEPT

_____
Signature

Jill Cilmi, Attorney in fact
Printed Name

05/04/2017
Date

**REQUIRED** – check only one and fill in the corresponding blank if signing for an entity:

| ☐ I am the individual **Manager** of this manager-managed LLC **or** I am signing for an **entity manager named:** | ☒ I am a **Member** of this member-managed LLC **or** I am signing for an **entity member named:** Ferrosafe Holdings LLC | ☐ I am a **Statutory Agent** changing only my own address and/or my own name. |
| --- | --- | --- |

| Filing Fee:  $5.00 (regular processing) Expedited processing – add $35.00 to filing fee. All fees are nonrefundable - see Instructions. | Mail:  Arizona Corporation Commission - Corporate Filings Section 1300 W. Washington St., Phoenix, Arizona  85007 Fax:    602-542-4100 |
| --- | --- |

Please be advised that A.C.C. forms reflect only the **minimum** provisions required by statute.  You should seek private legal counsel for those matters that may pertain to the individual needs of your business.
All documents filed with the Arizona Corporation Commission are **public record** and are open for public inspection.
If you have questions after reading the Instructions, please call 602-542-3026 or (within Arizona only) 800-345-5819.

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

# STATUTORY AGENT ACCEPTANCE

*Please read Instructions M002i*

1. **ENTITY NAME** – give the **exact** name in Arizona of the corporation or LLC that has appointed the Statutory Agent (this must match exactly the name as listed on the document appointing the statutory agent, e.g., Articles of Organization or Article of Incorporation):

   Ferrosafe, LLC
   _____

2. **STATUTORY AGENT NAME** – give the exact name of the Statutory Agent appointed by the entity listed in number 1 above (this will be *either* an individual or an entity). *NOTE* - the name must match **exactly** the statutory agent name as listed in the document that appoints the statutory agent (e.g. Articles of Incorporation or Articles of Organization), including any middle initial or suffix:

   Corporation Service Company
   _____

3. **STATUTORY AGENT SIGNATURE:**

   By the signature appearing below, the individual or entity named in number 2 above accepts the appointment as statutory agent for the entity named in number 1 above, and acknowledges that the appointment is effective until the appointing entity replaces the statutory agent or the statutory agent resigns, whichever occurs first.

   The person signing below declares and certifies *under penalty of perjury* that the information contained within this document together with any attachments is true and correct, and is submitted in compliance with Arizona law.

   Corporation Service Company

   By: _____    Grace E. Kirby, Assistant Vice President    05/04/2017
   Signature                                                    Printed Name                                              Date

**REQUIRED** – check only one:

| ☐ **Individual as statutory agent:** I am signing on behalf of myself as the individual (natural person) named as statutory agent. | ☒ **Entity as statutory agent:** I am signing on behalf of the entity named as statutory agent, and I am authorized to act for that entity. |
|---|---|

| Filing Fee:  none (regular processing) Expedited processing – not applicable. All fees are nonrefundable - see Instructions. | Mail: Fax: | Arizona Corporation Commission - Corporate Filings Section 1300 W. Washington St., Phoenix, Arizona  85007 602-542-4100 |
|---|---|---|

Please be advised that A.C.C. forms reflect only the **minimum** provisions required by statute.  You should seek private legal counsel for those matters that may pertain to the individual needs of your business.
All documents filed with the Arizona Corporation Commission are **public record** and are open for public inspection.
If you have questions after reading the Instructions, please call 602-542-3026 or (within Arizona only) 800-345-5819.

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

# LLC STATEMENT OF CHANGE
## OF KNOWN PLACE OF BUSINESS ADDRESS OR STATUTORY AGENT

*Read the Instructions L020i*

**NOTE** – *no matter what is being changed, numbers 1, 2, 3.1, 4.1, and 4.2 must be completed. The form will be rejected if those sections are not completed.*

1. **ENTITY NAME** – give the exact name of the LLC as currently shown in A.C.C. records:

   Ferrosafe, LLC

2. **A.C.C. FILE NUMBER:** L20520783

   Find the A.C.C. file number on the upper corner of filed documents OR on our website at: http://www.azcc.gov/Divisions/Corporations

| 3. **ARIZONA KNOWN PLACE OF BUSINESS ADDRESS:** | | | | | | |
|---|---|---|---|---|---|---|
| **3.1** *REQUIRED* – list the known place of business address currently shown in A.C.C. records (before any changes): | | | **3.2** *Optional* - List the NEW known place of business address in Arizona (must be a street or physical address): | | | |
| Attention (optional) | | | Attention (optional) | | | |
| 7280 North Glen Harbor Boulevard | | | | | | |
| Address 1 | | | Address 1 | | | |
| Address 2 (optional) | | | Address 2 (optional) | | | |
| City Glendale | AZ | 85307 | City | | State | Zip |
| | State | Zip | | | | |

**3.3  If you completed 3.2**, is the NEW known place of business address in Arizona the same as the street address of the statutory agent?   ☐ Yes  ☐ No

4. **CURRENT OR EXISTING STATUTORY AGENT** – list the name and addresses of the statutory agent as shown in the records of the Arizona Corporation Commission *before any changes* (this is the existing statutory agent):

| **4.1** *REQUIRED* – list the **name** and ***physical or street address*** (not a P.O. Box) in Arizona of the existing statutory agent: | | | **4.2** *REQUIRED* – list the **mailing address** (if one exists in A.C.C. records) in Arizona of the existing Statutory Agent: | | | |
|---|---|---|---|---|---|---|
| John Rumble | | | | | | |
| Statutory Agent Name | | | | | | |
| Attention (optional) | | | Attention (optional) | | | |
| 7280 North Glen Harbor Boulevard | | | 7280 North Glen Harbor Boulevard | | | |
| Address 1 | | | Address 1 | | | |
| Address 2 (optional) | | | Address 2 (optional) | | | |
| City Glendale | AZ | 85307 | City Glendale | AZ | 85307 | |
| | State | Zip | | State | Zip | |

**4.3** ☐ **CHANGE IN EXISTING STATUTORY AGENT NAME ONLY** – if the *name only* of the existing statutory agent listed in number 4.1 above has changed, but a new agent has not been appointed, check the box and give the new name of the existing statutory agent below:

_____

**4.4** **CHANGE IN EXISTING STATUTORY AGENT ADDRESS** – check all that apply and follow instructions:

    ☐ **STREET ADDRESS CHANGED** – complete number 4.5.

    ☐ **MAILING ADDRESS CHANGED** – complete number 4.6.

| **4.5 NEW STREET ADDRESS** – give the NEW physical or street address (not a P.O. Box) in Arizona of the existing statutory agent: | | | **4.6 NEW MAILING ADDRESS** – give the NEW mailing address in Arizona of the existing statutory agent (can be a P.O. Box): | | |
|---|---|---|---|---|---|
| Attention (optional) | | | Attention (optional) | | |
| Address 1 | | | Address 1 | | |
| Address 2 (optional) | | | Address 2 (optional) | | |
| City | State | Zip | City | State | Zip |

| **5.** ☒ **NEW STATUTORY AGENT** – if a new statutory agent is being appointed, check the box and complete the following for the **NEW statutory agent**: | | | | | |
|---|---|---|---|---|---|
| **5.1** *REQUIRED* – give the name (can be an individual or an entity) and physical or street address (not a P.O. Box) in Arizona of the NEW statutory agent: | | | **5.2** *OPTIONAL* – mailing address in Arizona of NEW Statutory Agent (can be a P.O. Box): | | |
| Corporation Service Company | | | | | |
| Statutory Agent Name | | | | | |
| Attention (optional) | | | Attention (optional) | | |
| 2338 W. Royal Palm Road, Suite J | | | 2338 W. Royal Palm Road, Suite J | | |
| Address 1 | | | Address 1 | | |
| Address 2 (optional) | AZ | 85021 | Address 2 (optional) | AZ | 85021 |
| City  Phoenix | State | Zip | City  Phoenix | State | Zip |
| **5.3** *REQUIRED* – if you are appointing a new statutory agent, the <u>Statutory Agent Acceptance</u> form M002 must be submitted along with this Statement of Change form. | | | | | |

**SIGNATURE** – *see Instructions L020i for who is authorized to make changes:*

If the person signing this form is the existing statutory agent changing its own address, then by the signature appearing below, the existing statutory agent certifies *under penalty of perjury* that he or she has given the LLC named in number 1 above written notice of the address change.

By checking the box marked "I accept" below, I acknowledge *under penalty of perjury* that this document together with any attachments is submitted in compliance with Arizona law.

| | |
|---|---|
| *Jill E. Cilmi* (signature) | ☒ I ACCEPT |
| Signature | Jill Cilmi, Attorney in fact |
| | Printed Name          05/04/2017 |
| | Date |

**REQUIRED** – check only one and fill in the corresponding blank if signing for an entity:

| ☐ I am the individual **Manager** of this manager-managed LLC **or** I am signing for an **entity manager named:** | ☒ I am a **Member** of this member-managed LLC **or** I am signing for an **entity member named:** Ferrosafe Holdings LLC | ☐ I am a **Statutory Agent** changing only my own address and/or my own name. |
|---|---|---|

| Filing Fee:  $5.00 (regular processing) Expedited processing – add $35.00 to filing fee. All fees are nonrefundable - see Instructions. | Mail: | Arizona Corporation Commission - Corporate Filings Section 1300 W. Washington St., Phoenix, Arizona  85007 |
|---|---|---|
| | Fax: | 602-542-4100 |

Please be advised that A.C.C. forms reflect only the **minimum** provisions required by statute.  You should seek private legal counsel for those matters that may pertain to the individual needs of your business.
All documents filed with the Arizona Corporation Commission are **public record** and are open for public inspection.
If you have questions after reading the Instructions, please call 602-542-3026 or (within Arizona only) 800-345-5819.

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

# STATUTORY AGENT ACCEPTANCE

*Please read Instructions M002i*

1. **ENTITY NAME –** give the **exact** name in Arizona of the corporation or LLC that has appointed the Statutory Agent (this must match exactly the name as listed on the document appointing the statutory agent, e.g., Articles of Organization or Article of Incorporation):

   Ferrosafe, LLC

2. **STATUTORY AGENT NAME –** give the exact name of the Statutory Agent appointed by the entity listed in number 1 above (this will be *either* an individual or an entity). *NOTE* - the name must match **exactly** the statutory agent name as listed in the document that appoints the statutory agent (e.g. Articles of Incorporation or Articles of Organization), including any middle initial or suffix:

   Corporation Service Company

3. **STATUTORY AGENT SIGNATURE:**

   By the signature appearing below, the individual or entity named in number 2 above accepts the appointment as statutory agent for the entity named in number 1 above, and acknowledges that the appointment is effective until the appointing entity replaces the statutory agent or the statutory agent resigns, whichever occurs first.

   The person signing below declares and certifies *under penalty of perjury* that the information contained within this document together with any attachments is true and correct, and is submitted in compliance with Arizona law.

   Corporation Service Company

   By: _Grace E. Kirby_   Grace E. Kirby, Assistant Vice President   05/04/2017
   Signature                              Printed Name                                      Date

**REQUIRED** – check only one:

| ☐ **Individual as statutory agent:** I am signing on behalf of myself as the individual (natural person) named as statutory agent. | ☒ **Entity as statutory agent:** I am signing on behalf of the entity named as statutory agent, and I am authorized to act for that entity. |
|---|---|

| Filing Fee:  none (regular processing) Expedited processing – not applicable. All fees are nonrefundable - see Instructions. | Mail: | Arizona Corporation Commission - Corporate Filings Section 1300 W. Washington St., Phoenix, Arizona  85007 |
|---|---|---|
| | Fax: | 602-542-4100 |

Please be advised that A.C.C. forms reflect only the **minimum** provisions required by statute.  You should seek private legal counsel for those matters that may pertain to the individual needs of your business.
All documents filed with the Arizona Corporation Commission are **public record** and are open for public inspection.
If you have questions after reading the Instructions, please call 602-542-3026 or (within Arizona only) 800-345-5819.

STATE OF _ALABAMA_ )

COUNTY OF _LEE_ )

# POWER OF ATTORNEY

NOTICE IS HEREBY GIVEN THAT _MARK GARDNER_, the _CEO_ of Ferrovia Services, LLC ("the Company"), a _LLC_ established under the laws of _DELAWARE_, and of the subsidiary entities shown on the list appended hereto, does hereby appoint Jill Cilmi and Elizabeth A. Dawson attorneys-in-fact for the Company and for the subsidiary entities, to act for the Company and for the subsidiary entities and in the name of the Company and of the subsidiary entities for the limited purposes authorized herein.

The Company and the subsidiary entities, having taken all necessary steps to authorize the changes and the establishment of this Power of Attorney, hereby grants its attorneys-in-fact the power to execute the documents necessary to change the Company's and the subsidiary entities' registered agent and registered office, or the agent and office of similar import, in any jurisdiction.

In the execution of any documents necessary for the purposes set forth herein, Jill Cilmi shall exercise the power of Vice President and Elizabeth A. Dawson shall exercise the power of Secretary, or, in the case of entities having managers or other positions of authority rather than officers such as Vice President or Secretary, the named individuals shall act in such office and with such authority as is required to effect the changes herein contemplated.

This Power of Attorney expires upon the earlier to occur of (a) completion and filing of the documents necessary to effect the changes in registered agent and registered office addresses contemplated herein, or (b) six (6) months after the Effective Date set forth below. The Company may revoke this Power of Attorney at any time by notice to Jill Cilmi and Elizabeth A. Dawson.

IN WITNESS WHEREOF the undersigned has executed this Power of Attorney on this _16_ day of _March_, 20_17_ (the "Effective Date").

Ferrovia Services, LLC

BY: _____

Subscribed and sworn to before me this _16th_ day of _March_, 20_16_.

_____
Notary Public

- 9 -

# EXHIBIT E

AZ Corp. Commission



05960538

**RECEIVED**

JUN 1 5 2017

ARIZONA CORP. COMMISSION
CORPORATIONS DIVISION

---

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

## LLC STATEMENT OF CHANGE
## OF KNOWN PLACE OF BUSINESS ADDRESS OR STATUTORY AGENT

*Read the Instructions L020i*

**NOTE** – *no matter what is being changed, numbers 1, 2, 3.1, 4.1, and 4.2 must be completed. The form will be rejected if those sections are not completed.*

1. **ENTITY NAME** – give the exact name of the LLC as currently shown in A.C.C. records:

   Ferrosafe Holdings, LLC

2. **A.C.C. FILE NUMBER:** L20520681
   Find the A.C.C. file number on the upper corner of filed documents OR on our website at: http://www.azcc.gov/Divisions/Corporations

3. **ARIZONA KNOWN PLACE OF BUSINESS ADDRESS:**

| 3.1 REQUIRED – list the known place of business address currently shown in A.C.C. records (before any changes): | 3.2 Optional - List the NEW known place of business address in Arizona (must be a street or physical address): |
|---|---|
| Attention (optional) | Attention (optional) |
| 7280 North Glen Harbor Boulevard | |
| Address 1 | Address 1 |
| Address 2 (optional) | Address 2 (optional) |
| City Glendale · State AZ · Zip 85307 | City · State · Zip |

**3.3  If you completed 3.2, is the NEW known place of business address in Arizona the same as the street address of the statutory agent?**   ☐ Yes   ☐ No

4. **CURRENT OR EXISTING STATUTORY AGENT** – list the name and addresses of the statutory agent as shown in the records of the Arizona Corporation Commission *before any changes* (this is the existing statutory agent):

| 4.1 REQUIRED – list the name and physical or street address (not a P.O. Box) in Arizona of the existing statutory agent: | 4.2 REQUIRED – list the mailing address (if one exists in A.C.C. records) in Arizona of the existing Statutory Agent: |
|---|---|
| John Rumble | |
| Statutory Agent Name | |
| Attention (optional) | Attention (optional) |
| 7280 North Glen Harbor Boulevard | 7280 North Glen Harbor Boulevard |
| Address 1 | Address 1 |
| Address 2 (optional) | Address 2 (optional) |
| City Glendale · State AZ · Zip 85307 | City Glendale · State AZ · Zip 85307 |

L020.001
Rev: 2010

Arizona Corporation Commission – Corporations Division
Page 1 of 3

**4.3** ☐ **CHANGE IN EXISTING STATUTORY AGENT NAME ONLY** – if the *name only* of the existing statutory agent listed in number 4.1 above has changed, but a new agent has not been appointed, check the box and give the new name of the existing statutory agent below:

_____

**4.4** **CHANGE IN EXISTING STATUTORY AGENT ADDRESS** – check all that apply and follow instructions:

☐ **STREET ADDRESS CHANGED** – complete number 4.5.

☐ **MAILING ADDRESS CHANGED** – complete number 4.6.

| **4.5 NEW STREET ADDRESS** – give the NEW physical or street address (not a P.O. Box) in Arizona of the existing statutory agent: | | | **4.6 NEW MAILING ADDRESS** – give the NEW mailing address in Arizona of the existing statutory agent (can be a P.O. Box): | | |
|---|---|---|---|---|---|
| Attention (optional) | | | Attention (optional) | | |
| Address 1 | | | Address 1 | | |
| Address 2 (optional) | | | Address 2 (optional) | | |
| City | State | Zip | City | State | Zip |

---

**5.** ☒ **NEW STATUTORY AGENT** – if a new statutory agent is being appointed, check the box and complete the following for the **NEW statutory agent**:

| **5.1** *REQUIRED* – give the name (can be an individual or an entity) and physical or street address (not a P.O. Box) in Arizona of the NEW statutory agent: | | | **5.2** *OPTIONAL* – mailing address in Arizona of NEW Statutory Agent (can be a P.O. Box): | | |
|---|---|---|---|---|---|
| Corporation Service Company | | | | | |
| Statutory Agent Name | | | | | |
| Attention (optional) | | | Attention (optional) | | |
| 2338 W. Royal Palm Road, Suite J | | | 2338 W. Royal Palm Road, Suite J | | |
| Address 1 | | | Address 1 | | |
| Address 2 (optional) | | | Address 2 (optional) | | |
| City Phoenix | State AZ | Zip 85021 | City Phoenix | State AZ | Zip 85021 |

**5.3** *REQUIRED* – if you are appointing a new statutory agent, the Statutory Agent Acceptance form M002 must be submitted along with this Statement of Change form.

**SIGNATURE** – _see Instructions L020i_ for who is authorized to make changes:

If the person signing this form is the existing statutory agent changing its own address, then by the signature appearing below, the existing statutory agent certifies _under penalty of perjury_ that he or she has given the LLC named in number 1 above written notice of the address change.

By checking the box marked "I accept" below, I acknowledge _under penalty of perjury_ that this document together with any attachments is submitted in compliance with Arizona law.

| | ☒ I ACCEPT | |
|---|---|---|
| _Jill E. Cilmi_ | Jill Cilmi, Vice President on behalf of | 06/13/2017 |
| Signature | Printed Name | Date |

**REQUIRED** – check only one and fill in the corresponding blank if signing for an entity:

| ☐ I am the individual **Manager** of this manager-managed LLC **or** I am signing for an **entity manager named:** | ☒ I am a **Member** of this member-managed LLC **or** I am signing for an **entity member named:**<br><br>RUMBLE SPRAY INC | ☐ I am a **Statutory Agent** changing only my own address and/or my own name. |
|---|---|---|

| Filing Fee: $5.00 (regular processing)<br>Expedited processing – add $35.00 to filing fee.<br>All fees are nonrefundable - see Instructions. | Mail:<br><br>Fax: | Arizona Corporation Commission - Corporate Filings Section<br>1300 W. Washington St., Phoenix, Arizona 85007<br>602-542-4100 |
|---|---|---|

Please be advised that A.C.C. forms reflect only the **minimum** provisions required by statute. You should seek private legal counsel for those matters that may pertain to the individual needs of your business.
All documents filed with the Arizona Corporation Commission are **public record** and are open for public inspection.
If you have questions after reading the Instructions, please call 602-542-3026 or (within Arizona only) 800-345-5819.

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

# STATUTORY AGENT ACCEPTANCE

*Please read Instructions M002i*

1. **ENTITY NAME –** give the **exact** name in Arizona of the corporation or LLC that has appointed the Statutory Agent (this must match exactly the name as listed on the document appointing the statutory agent, e.g., Articles of Organization or Article of Incorporation):

   Ferrosafe Holdings, LLC

2. **STATUTORY AGENT NAME –** give the exact name of the Statutory Agent appointed by the entity listed in number 1 above (this will be *either* an individual or an entity). *NOTE* - the name must match **exactly** the statutory agent name as listed in the document that appoints the statutory agent (e.g. Articles of Incorporation or Articles of Organization), including any middle initial or suffix:

   Corporation Service Company

3. **STATUTORY AGENT SIGNATURE:**

   By the signature appearing below, the individual or entity named in number 2 above accepts the appointment as statutory agent for the entity named in number 1 above, and acknowledges that the appointment is effective until the appointing entity replaces the statutory agent or the statutory agent resigns, whichever occurs first.

   The person signing below declares and certifies *under penalty of perjury* that the information contained within this document together with any attachments is true and correct, and is submitted in compliance with Arizona law.

Corporation Service Company

| | | |
|---|---|---|
| By: *Grace E. Kirby* | Grace E. Kirby, Assistant Vice President | 06/13/2017 |
| Signature | Printed Name | Date |

**REQUIRED** – check only one:

| ☐ **Individual as statutory agent:** I am signing on behalf of myself as the individual (natural person) named as statutory agent. | ☒ **Entity as statutory agent:** I am signing on behalf of the entity named as statutory agent, and I am authorized to act for that entity. |
|---|---|

| Filing Fee:  none (regular processing) Expedited processing – not applicable. All fees are nonrefundable - see Instructions. | Mail: Fax: | Arizona Corporation Commission - Corporate Filings Section 1300 W. Washington St., Phoenix, Arizona  85007 602-542-4100 |
|---|---|---|

Please be advised that A.C.C. forms reflect only the **minimum** provisions required by statute.  You should seek private legal counsel for those matters that may pertain to the individual needs of your business.
All documents filed with the Arizona Corporation Commission are **public record** and are open for public inspection.
If you have questions after reading the Instructions, please call 602-542-3026 or (within Arizona only) 800-345-5819.

M002.003
Rev: 9/2014

Arizona Corporation Commission – Corporations Division
Page 1 of 1

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

# LLC STATEMENT OF CHANGE
# OF KNOWN PLACE OF BUSINESS ADDRESS OR STATUTORY AGENT

*Read the Instructions* L020i

**NOTE** – *no matter what is being changed, numbers 1, 2, 3.1, 4.1, and 4.2 must be completed. The form will be rejected if those sections are not completed.*

1. **ENTITY NAME** – give the exact name of the LLC as currently shown in A.C.C. records:

   Ferrosafe Holdings, LLC

2. **A.C.C. FILE NUMBER:** L20520681

   Find the A.C.C. file number on the upper corner of filed documents OR on our website at: http://www.azcc.gov/Divisions/Corporations

| 3. | **ARIZONA KNOWN PLACE OF BUSINESS ADDRESS:** |
|---|---|
| **3.1** *REQUIRED* – list the known place of business address currently shown in A.C.C. records (before any changes): | **3.2** *Optional* - List the NEW known place of business address in Arizona (must be a street or physical address): |

| Attention (optional) | | | Attention (optional) | | |
|---|---|---|---|---|---|
| 7280 North Glen Harbor Boulevard | | | | | |
| Address 1 | | | Address 1 | | |
| Address 2 (optional) | | | Address 2 (optional) | | |
| City Glendale | AZ State | 85307 Zip | City | State | Zip |

**3.3  If you completed 3.2, is the NEW known place of business address in Arizona the same as the street address of the statutory agent?**  ☐ Yes  ☐ No

4. **CURRENT OR EXISTING STATUTORY AGENT** – list the name and addresses of the statutory agent as shown in the records of the Arizona Corporation Commission *before any changes* (this is the existing statutory agent):

| **4.1** *REQUIRED* – list the **name** and **physical or street address** (not a P.O. Box) in Arizona of the existing statutory agent: | **4.2** *REQUIRED* – list the **mailing address** (if one exists in A.C.C. records) in Arizona of the existing Statutory Agent: |
|---|---|
| John Rumble | |
| Statutory Agent Name | |

| Attention (optional) | | | Attention (optional) | | |
|---|---|---|---|---|---|
| 7280 North Glen Harbor Boulevard | | | 7280 North Glen Harbor Boulevard | | |
| Address 1 | | | Address 1 | | |
| Address 2 (optional) | | | Address 2 (optional) | | |
| City Glendale | AZ State | 85307 Zip | City Glendale | AZ State | 85307 Zip |

L020.001
Rev: 2010

**4.3**  ☐ **CHANGE IN EXISTING STATUTORY AGENT NAME ONLY** – if the *name only* of the existing statutory agent listed in number 4.1 above has changed, but a new agent has not been appointed, check the box and give the new name of the existing statutory agent below:

_____

**4.4**  **CHANGE IN EXISTING STATUTORY AGENT ADDRESS** – check all that apply and follow instructions:

☐ **STREET ADDRESS CHANGED** – complete number 4.5.

☐ **MAILING ADDRESS CHANGED** – complete number 4.6.

| **4.5  NEW STREET ADDRESS** – give the NEW physical or street address (not a P.O. Box) in Arizona of the existing statutory agent: | | | **4.6  NEW MAILING ADDRESS** – give the NEW mailing address in Arizona of the existing statutory agent (can be a P.O. Box): | | |
|---|---|---|---|---|---|
| Attention (optional) | | | Attention (optional) | | |
| Address 1 | | | Address 1 | | |
| Address 2 (optional) | | | Address 2 (optional) | | |
| City | State | Zip | City | State | Zip |

| **5.  ☒  NEW STATUTORY AGENT** – if a new statutory agent is being appointed, check the box and complete the following for the **NEW statutory agent**: | | | | | |
|---|---|---|---|---|---|
| **5.1**  *REQUIRED* – give the name (can be an individual or an entity) and physical or street address (not a P.O. Box) in Arizona of the NEW statutory agent: | | | **5.2**  *OPTIONAL* – mailing address in Arizona of NEW Statutory Agent (can be a P.O. Box): | | |
| Corporation Service Company | | | | | |
| Statutory Agent Name | | | | | |
| Attention (optional) | | | Attention (optional) | | |
| 2338 W. Royal Palm Road, Suite J | | | 2338 W. Royal Palm Road, Suite J | | |
| Address 1 | | | Address 1 | | |
| Address 2 (optional) | | | Address 2 (optional) | | |
| City  Phoenix | AZ State | 85021 Zip | City  Phoenix | AZ State | 85021 Zip |
| **5.3**  *REQUIRED* – if you are appointing a new statutory agent, the Statutory Agent Acceptance form M002 must be submitted along with this Statement of Change form. | | | | | |

**SIGNATURE** – _see Instructions L020i for who is authorized to make changes:_

If the person signing this form is the existing statutory agent changing its own address, then by the signature appearing below, the existing statutory agent certifies _under penalty of perjury_ that he or she has given the LLC named in number 1 above written notice of the address change.

By checking the box marked "I accept" below, I acknowledge _under penalty of perjury_ that this document together with any attachments is submitted in compliance with Arizona law.

| | ☒ I ACCEPT | |
|---|---|---|
| _Jill E. Cilmi_ | Jill Cilmi, Vice President on behalf of | 06/13/2017 |
| Signature | Printed Name | Date |

**REQUIRED** – check only one and fill in the corresponding blank if signing for an entity:

| ☐ I am the individual **Manager** of this manager-managed LLC **or** I am signing for an **entity manager named:** | ☒ I am a **Member** of this member-managed LLC **or** I am signing for an **entity member named:**<br><br>RUMBLE SPRAY INC | ☐ I am a **Statutory Agent** changing only my own address and/or my own name. |
|---|---|---|

| Filing Fee:  $5.00 (regular processing)<br>Expedited processing – add $35.00 to filing fee.<br>All fees are nonrefundable - see Instructions. | Mail: | Arizona Corporation Commission - Corporate Filings Section<br>1300 W. Washington St., Phoenix, Arizona  85007 |
|---|---|---|
| | Fax: | 602-542-4100 |

Please be advised that A.C.C. forms reflect only the **minimum** provisions required by statute.  You should seek private legal counsel for those matters that may pertain to the individual needs of your business.
All documents filed with the Arizona Corporation Commission are **public record** and are open for public inspection.
If you have questions after reading the Instructions, please call 602-542-3026 or (within Arizona only) 800-345-5819.

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

# STATUTORY AGENT ACCEPTANCE

*Please read Instructions M002i*

1. **ENTITY NAME –** give the **exact** name in Arizona of the corporation or LLC that has appointed the Statutory Agent (this must match exactly the name as listed on the document appointing the statutory agent, e.g., Articles of Organization or Article of Incorporation):

   Ferrosafe Holdings, LLC

2. **STATUTORY AGENT NAME –** give the exact name of the Statutory Agent appointed by the entity listed in number 1 above (this will be *either* an individual or an entity). *NOTE* - the name must match **exactly** the statutory agent name as listed in the document that appoints the statutory agent (e.g. Articles of Incorporation or Articles of Organization), including any middle initial or suffix:

   Corporation Service Company

3. **STATUTORY AGENT SIGNATURE:**

   By the signature appearing below, the individual or entity named in number 2 above accepts the appointment as statutory agent for the entity named in number 1 above, and acknowledges that the appointment is effective until the appointing entity replaces the statutory agent or the statutory agent resigns, whichever occurs first.

   The person signing below declares and certifies *under penalty of perjury* that the information contained within this document together with any attachments is true and correct, and is submitted in compliance with Arizona law.

Corporation Service Company

By: _Grace E. Kirby_                    Grace E. Kirby, Assistant Vice President        06/13/2017

Signature                                                Printed Name                                            Date

**REQUIRED –** check only one:

| ☐ **Individual as statutory agent:** I am signing on behalf of myself as the individual (natural person) named as statutory agent. | ☒ **Entity as statutory agent:** I am signing on behalf of the entity named as statutory agent, and I am authorized to act for that entity. |
|---|---|

| Filing Fee:  none (regular processing) Expedited processing – not applicable. All fees are nonrefundable - see Instructions. | Mail: Fax: | Arizona Corporation Commission - Corporate Filings Section 1300 W. Washington St., Phoenix, Arizona  85007 602-542-4100 |
|---|---|---|

Please be advised that A.C.C. forms reflect only the **minimum** provisions required by statute.  You should seek private legal counsel for those matters that may pertain to the individual needs of your business.
All documents filed with the Arizona Corporation Commission are **public record** and are open for public inspection.
If you have questions after reading the Instructions, please call 602-542-3026 or (within Arizona only) 800-345-5819.

STATE OF _ALABAMA_ )

COUNTY OF _LEE_ )

# POWER OF ATTORNEY

NOTICE IS HEREBY GIVEN THAT _MARK GARDNER_, the _CEO_ of Ferrovia Services, LLC ("the Company"), a _LLC_ established under the laws of _DELAWARE_, and of the subsidiary entities shown on the list appended hereto, does hereby appoint Jill Cilmi and Elizabeth A. Dawson attorneys-in-fact for the Company and for the subsidiary entities, to act for the Company and for the subsidiary entities and in the name of the Company and of the subsidiary entities for the limited purposes authorized herein.

The Company and the subsidiary entities, having taken all necessary steps to authorize the changes and the establishment of this Power of Attorney, hereby grants its attorneys-in-fact the power to execute the documents necessary to change the Company's and the subsidiary entities' registered agent and registered office, or the agent and office of similar import, in any jurisdiction.

In the execution of any documents necessary for the purposes set forth herein, Jill Cilmi shall exercise the power of Vice President and Elizabeth A. Dawson shall exercise the power of Secretary, or, in the case of entities having managers or other positions of authority rather than officers such as Vice President or Secretary, the named individuals shall act in such office and with such authority as is required to effect the changes herein contemplated.

This Power of Attorney expires upon the earlier to occur of (a) completion and filing of the documents necessary to effect the changes in registered agent and registered office addresses contemplated herein, or (b) six (6) months after the Effective Date set forth below.  The Company may revoke this Power of Attorney at any time by notice to Jill Cilmi and Elizabeth A. Dawson.

IN WITNESS WHEREOF the undersigned has executed this Power of Attorney on this _16_ day of _MARCH_, 20_17_ (the "Effective Date").

Ferrovia Services, LLC

BY: _____

_____

Subscribed and sworn to before me this _16th_ day of _March_, 20_16_.

_____
Notary Public

- 9 -

# EXHIBIT F

**F0108**                         **2014150941**

**Fee:** $



Business ID: 1023263
Filed: 11/21/2014 10:56 AM
C. Delbert Hosemann, Jr.
Secretary of State

**DELBERT HOSEMANN**
*Secretary of State*

**P.O. BOX 136**
**JACKSON, MS 39205-0136**

**TELEPHONE: (601) 359-1633**

## 2014  LLC Annual Report

### Business Information

*Business ID:*  1023263                *Business Name:*  Ferrosafe, LLC

*State of Incorporation:*  MS           *Business Email:*  kristenharwell@ferrosafe.com

*Phone:* (***)***-****

*FEIN:* **-*******

*Principal Address:*      1220 Lyncrest Avenue
Jackson, MS 39202

### Registered Agent

*Name:*      Harwell, Robert

*Address:*      1220 Lyncrest Avenue
Jackson, MS 39202

### Managers and Members

### Managers

*Name:*                                  *Address:*

Kristen Harwell                          1220 Lyncrest Avenue
*Manager*                                Jackson, MS 39202

## Officers

| Title/Name: | Address: | Director: |
|---|---|---|
| **President:** | | ☐ |
| **Vice President:** | | ☐ |
| **Secretary:** | | ☐ |
| **Treasurer:** | | ☐ |

☑  This LLC has a written Operating Agreement.

## NAICS Code/Nature of Business

561730 - Landscaping Services

## Signature

By entering my name in the space provided, I certify that I am authorized to file this document on behalf of this entity, have examined the document and, to the best of my knowledge and belief, it is true, correct and complete as of this day *11/21/2014*.

| Name: | Address: |
|---|---|
| Kristen Harwell | 1220 Lyncrest Avenue |
| *Manager* | Jackson, MS 39202 |

## Officers List

| *Name:* | *Address:* |
| --- | --- |
| Robert Harwell<br>*Organizer* | 1220 Lyncrest Avenue<br>Jackson, MS 39202 |
| Kristen Harwell<br>*Manager* | 1220 Lyncrest Avenue<br>Jackson, MS 39202 |

EXHIBIT G

**F0108**                          **2015342268**



Business ID: 1023263
Filed: 06/04/2015 09:09 PM
C. Delbert Hosemann, Jr.
Secretary of State

**Fee:** $

**DELBERT HOSEMANN**
*Secretary of State*

**P.O. BOX 136**
**JACKSON, MS 39205-0136**

**TELEPHONE: (601) 359-1633**

## 2015  LLC Annual Report

### Business Information

*Business ID:*  1023263            *Business Name:*  Ferrosafe, LLC

*State of Incorporation:*  MS      *Business Email:*  kristenharwell@ferrosafe.com

*Phone:* (***)***-****

*FEIN:* **-*******

*Principal Address:*   1880 Lakeland Drive, Suite F
                       Jackson, MS 39216

### Registered Agent

*Name:*     Harwell, Robert

*Address:*  1220 Lyncrest Avenue
            Jackson, MS 39202

### Managers and Members

### Managers

*Name:*                            *Address:*

Kristen Harwell                    1880 Lakeland Drive, Suite F
*Manager*                          Jackson, MS 39216

## Officers

| *Title/Name:* | *Address:* | *Director:* |
|---|---|---|
| **President:** | | ☐ |
| **Vice President:** | | ☐ |
| **Secretary:** | | ☐ |
| **Treasurer:** | | ☐ |

☑  This LLC has a written Operating Agreement.

## NAICS Code/Nature of Business

561730 - Landscaping Services

## Signature

By entering my name in the space provided, I certify that I am authorized to file this document on behalf of this entity, have examined the document and, to the best of my knowledge and belief, it is true, correct and complete as of this day *06/04/2015*.

| *Name:* | *Address:* |
|---|---|
| Kristen Harwell | 1880 Lakeland Drive, Suite F |
| *Manager* | Jackson, MS 39216 |

## **Officers List**

| *Name:* | *Address:* |
|---|---|
| Robert Harwell<br>*Organizer* | 1220 Lyncrest Avenue<br>Jackson, MS 39202 |
| Kristen Harwell<br>*Manager* | 1880 Lakeland Drive, Suite F<br>Jackson, MS 39216 |

# EXHIBIT H

**State of Washington**
**Business Licensing Service** | **Secretary of State**

RENEW YOUR
# Corporation or LLC

 Print

**RUMBLE SPRAY, INC.**
UBI : **601 314043**

## Thank you for renewing online

Your annual report has been completed and submitted. Please print this receipt for your records and allow 14 days to receive your license document in the mail.

Completed date and time: Mar 31 2015 2:27PM Pacific Time
Transaction number:      2015 090 5135
Payment type:            E-Check

| Your company | |
|---|---|
| Company name: | RUMBLE SPRAY, INC. |
| Unified business ID: | 601 314 043 |
| State of incorporation : | Washington |
| Date of incorporation : | 04/22/1991 |
| Expiration date: | 04/30/2016 |

| Your fees | |
|---|---|
| Domestic Profit Corporation: | $ 60.00 |
| Renewal application fee: | $ 11.00 |
| Total fees: | $ 71.00 |
| Previous payment: | $ 0.00 |
| Total amount charged: | $ 71.00 |

| Business information | |
|---|---|
| Principal place of business: | 500 First Ave<br>PO Box 1709<br>Zillah, Washington 98953<br>United States |
| Company telephone number: | (509) 829 5600 |
| Company email address: | None provided |
| Does your company own real property (including leasehold interests) in Washington? | No |

| Nature of business | |
|---|---|
| Type: | Other Services |

| Governing people | | |
|---|---|---|
| JOHN RUMBLE | President<br>Treasurer<br>Chairman of the Board<br>Director | 81 FLAGSTONE LANE<br>SUNNYSIDE, Washington 98944<br>United States |
| JASON RUMBLE | Vice President<br>Director | 2964 N GRANGER ROAD<br>ZILLAH, Washington 98953<br>United States |
| Jacob Cover | Director | 601 Rainier Ave<br>PO Box 1710<br>Zillah, Washington 98953<br>United States |
| Jeff Welsh | Secretary<br>Director | 2506 Oak Bowery Rd<br>Opelika, Alabama 36801<br>United States |
| Robert Harwell | Director | 1220 Lyncrest Ave<br>Jackson, Mississippi 39202<br>United States |

**Registered agent**

| | |
|---|---|
| Agent type on file: | Individual |
| Agent on file: | JOHN D RUMBLE |
| Agent's office street address on file: | 500 1ST AVE<br>ZILLAH, Washington  98953<br>United States |
| Agent's mailing address on file: | PO BOX 1709<br>ZILLAH, Washington  989531709<br>United States |

| Person completing this renewal | |
|---|---|
| Submitted By: | Jacob Cover |
| Title: | Director |
| Renewal certification: | I am the person listed above  and I certify under penalty of perjury that the renewal information submitted is true and correct to the best of my knowledge.  I understand that deliberately  submitting false information may be punishable as a gross misdemeanor. RCW 43.07.210 |

Home 

# EXHIBIT I



**FILED**
SECRETARY OF STATE
MAY 02, 2016
STATE OF WASHINGTON

05/02/16 3167326-
001
$10.00 K
tid:3235762

Office of the Secretary of State
Corporations & Charities Division

## INITIAL REPORT
FEE: $10.00

RETURN COMPLETED FORM AND PAYMENT TO:
*(Checks made payable to "Secretary of State")*

801 Capitol Way South
PO Box 40234
Olympia, WA 98504-0234

Entity Name: FERROSAFE, LLC
Payment Due By: 4/29/2016
Unified Business Identifier: 603-572-389
State of Incorporation: AZ
Inc./Qual. Date: 12/31/2015

## TYPE OR PRINT ALL INFORMATION IN DARK INK

| Current Registered Agent/Office | Registered Agent/Office Changes *(Changes must be approved by the Board of Directors)* |
|---|---|
| JACOB COVER<br>500 1ST AVE<br>ZILLAH, WA 98953 | New Registered Agent Name _____<br>Consent to<br>Appointment_____<br>*Signature of New Registered Agent*<br>Required Street<br>Address_____<br>City _____ State WA Zip Code_____<br>Optional Mailing Address **PO BOX 1709**<br>City **ZILLAH** State WA Zip Code **98953** |

## REPORT SECTION MUST BE FILLED IN COMPLETELY – DO NOT LEAVE SPACES BLANK

Principal place of business in WA ☐ YES **500 First Ave** ☐ NO  — *Address* — **Zillah** *City* — **WA** *State* — **98953** *Zip*

Nature of Business **Vegetation Management Services** Telephone **(509) 829-5600** Email **accounting@ferrosafe.com**

Foreign Entities - Principal office address.
**7280 N. Glen Harbor Blvd #105** **Glendale** **AZ** **85307** **USA**
*Address* *City* *State* *Zip* *Country*

☐ CORPORATION: Print or type names and addresses of ALL corporate officers and directors *(attach additional list if necessary).*
☒ LLC: Print or type names and addresses of Members or Managers *(attach additional list if necessary).*

| Name | Title | Address | City | State | Zip |
|---|---|---|---|---|---|
| JOHN D RUMBLE | PRESIDENT | 12720 W. Montebello | Litchfield Park | AZ | 85340 |
| JASON J RUMBLE | VICE PRESIDENT | 2964 N. Granger Rd | Zillah | WA | 98953 |
| JEFF WELSH | | 2506 Oak Bowery Rd | Opelika | AL | 36801 |
| MARK GARDNER | CFO | 1812 Coopers Pond Rd | Auburn | AL | 36830 |
| RYAN CAMMACK | | 1775 Eaglecrest Ct | Laramie | WY | 82072 |

SIGNATURE *Of governing person listed above* — **MARK GARDNER** CFO *Type or Print Name and Title* — **9/26/16** *Date*

CORPORATIONS INFORMATION AND ASSISTANCE – 360/725-0377

Rev. 01-006 4/14

# EXHIBIT J


Office of the Secretary of State
Corporations & Charities Division

| |
|---|
| Filed<br>Secretary of State<br>State of Washington<br>Date Filed: 04/28/2020<br>Effective Date: 04/28/2020<br>UBI #: 601 314 043 |

# Annual Report

## BUSINESS INFORMATION

Business Name:
**RUMBLE SPRAY, INC.**

UBI Number:
**601 314 043**

Business Type:
**WA PROFIT CORPORATION**

Business Status:
**ACTIVE**

Principal Office Street Address:
**500 1ST AVE, ZILLAH, WA, 98953, UNITED STATES**

Principal Office Mailing Address:
**PO BOX 1709, ZILLAH, WA, 98953-1709, UNITED STATES**

Expiration Date:
**04/30/2021**

Jurisdiction:
**UNITED STATES, WASHINGTON**

Formation/Registration Date:
**04/22/1991**

Period of Duration:
**PERPETUAL**

Inactive Date:

Nature of Business:
**OTHER SERVICES, ASSET RENTAL**

## REGISTERED AGENT    RCW 23.95.410

| Registered Agent Name | Street Address | Mailing Address |
|---|---|---|
| CORPORATION SERVICE COMPANY | 300 DESCHUTES WAY SW STE 208 MC-CSC1, TUMWATER, WA, 98501, UNITED STATES | 300 DESCHUTES WAY SW STE 208 MC-CSC1, TUMWATER, WA, 98501, UNITED STATES |

## PRINCIPAL OFFICE

Phone:

Email:
**ANNUALREPORTS@CSCGLOBAL.COM**

This document is a public record. For more information visit www.sos.wa.gov/corps

Street Address:
**500 1ST AVE, ZILLAH, WA, 98953, USA**

Mailing Address:
**PO BOX 1709, ZILLAH, WA, 98953-1709, USA**

## GOVERNORS

| Title | Type | Entity Name | First Name | Last Name |
|---|---|---|---|---|
| GOVERNOR | INDIVIDUAL | | ALLEN | BLYTHE |

## NATURE OF BUSINESS

- OTHER SERVICES
- ASSET RENTAL

## EFFECTIVE DATE

Effective Date:
**04/28/2020**

## CONTROLLING INTEREST

1.  Does your entity own real property such as land or buildings (including leasehold interests) in Washington?
**NO**
2.  As of January 1, 2019, has there been a transfer of stock, other financial interest change, or an option agreement exercised that resulted in a transfer of at least 16? percent interest in the entity?
**NO**
   a.  If "yes", has the transfer of stock, other financial interest change, or an option agreement exercised resulted in a transfer of controlling interest (50 percent or greater)?
**NO**
3.  As of January 1, 2019, has an option agreement been executed allowing for the future purchase or acquisition of the entity?
**NO**

You must report a Controlling Interest Transfer Return **IF**: you answered "yes" to questions 1 **AND** 2a.

Failure to report a Controlling Interest Transfer is subject to penalty provisions of RCW 82.45.220.

For more information on **Controlling Interest**, visit www.dor.wa.gov/REET.

## RETURN ADDRESS FOR THIS FILING

Attention:
Email:
Address:

## UPLOAD ADDITIONAL DOCUMENTS

Do you have additional documents to upload? **No**

## EMAIL OPT-IN

☐ By checking this box, I hereby opt into receiving all notifications from the Secretary of State for this entity via email only. I

acknowledge that I will no longer receive paper notifications.

## AUTHORIZED PERSON

☐ I am an authorized person.

Person Type:
**INDIVIDUAL**

First Name:
**ALLEN**

Last Name:
**BLYTHE**

Title:
**PRESIDENT**

☑ This document is hereby executed under penalty of law and is to the best of my knowledge, true and correct.

This document is a public record. For more information visit www.sos.wa.gov/corps

Work Order #: 2020042800233477 - 1
Received Date: 04/28/2020
Amount Received: $60.00

# EXHIBIT K

ferrosafe

ABOUT    SERVICES    INDUSTRIES    LOCATIONS    CONTACT US

# Who We Are

The people behind the hard-hats are truly the ones you do business with. We strongly believe that good business starts with good relationships.

## Who We Are

Personnel Ferrosafe currently maintains a **full-time staff of over 30 employees.** We also maintain a steady stream of qualified applicants thanks to our dedicated human resources manager, Jenny Katz. Should the amount of work we are awarded require additional personnel, we plan to first re-assign current employees and supplement those efforts by training additional personnel according to the systemic processes outlined in documents we send to you during the beginning stages of a job.

Our field staff includes **field managers** and **quality-check specialists** who provide ground level day-today guidance and supervision in addition to their work duties.

On the mechanical side, when required by project-sensitive concerns, we utilize a deep bench of contractors with special areas of expertise. We also supplement our mechanical field staff by having interns from natural resources schools at nearby universities work under the direct guidance of our field managers. This practice has afforded us the opportunity to grow our team by placing well-rounded and knowledgeable people in permanent positions within our organization.

Each member of our field staff spends upwards of 100 hours working directly alongside  a manager, and each Ferrosafe crew includes operators licensed in pesticide and herbicide application. All of our employees undergo background checks and safety training in compliance with Class I requirements such as eRailsafe, RWP safety training and railroad contractor orientation courses.

> *We believe that safety is the first and most important consideration in every project, and we operate accordingly.*

The below listed personnel are directly involved in operations management with many years of experience in pesticide applications in environments such as that presented by your company. All of our applicators carry appropriate licenses .

We are members of the **National Railroad Contractors Association**, allowing our team of applicators to attend these meetings each year in Indianapolis, Indiana, where they receive continued education as required by the states that they are licensed in. Each of our applicators also attend internal training sessions by our company to provide other levels of education dealing with specific needs.

Several states also hold educational classes which our personnel attend when applicable. In addition, **our company holds licenses in each state of operations as required by the state**, along with all needed permits required to legally and safely perform services in all states of operations.

### John Rumble, Chairman of the Board

John has a long history of over 45 years in the vegetation control market. As the chairman he continues to challenge the company towards a higher level of excellence and ethics and with his many years of experience offers counsel and direction for the board of directors.

### Jason Rumble, Chief Operating Officer

Jason is involved in all day-by-day direct communications with the management staff, railroad personnel, and supply companies, working to ensure that all operations are performed in a safe, smooth and efficient manner. Jason has been with the company for approximately 8 years.

### Dennis Worley, Director of Safety

As Safety Director, He oversees the safety and compliance of all operations including: DOT, chemical handling and storage, railroad spraying, brush cutting abatement, and OSHA. He also conducts weekly safety meetings, publish monthly safety letters, oversees the training of new hire

### Mark Gardner, Chief Financial Officer

Mark ensures that the companies administration systems, funding and reporting are adequate in order to support operational capacity required at all levels of the company. He has over 30 years of executive financial experience.

### Jacob Cover, Office manager

Jacob works to keep a smooth and effective flow of paperwork between staff, railroad personnel and other affected parties. He also handles all phases of accounting and other necessary documentation needed to keep clear documentation between company and railroad.



Ferrosafe provides commercial vegetation management services to the transportation and industrial sectors. With operations offices located in Washington, California, Alabama and Arizona and other assets strategically positioned based on customer needs, we can provide service across North America.

Ferrosafe strives to differentiate itself in the industry by approaching vegetation management with a customer-oriented, flexible perspective that complements operational capabilities with strategic planning.

Search site

### Contact Ferrosafe

⌂ 7280 N. Glen Harbor Blvd, Ste. 105 Glendale, AZ 85307

☎ 509-829-5600

✉ info@ferrosafe.com

### Contact Us

Name

Email

Type your message...

Enter Captcha

Not readable? Change text.




Find our how Ferrosafe can serve your industry    Contact Us

**CONTACT FERROSAFE**

Jason Rumble
Po Box 1709
Zillah, Wa 98953
Email: info@ferrosafe.com
Phone: 509-829-5600

⚠ Oops! Something went wrong.

This page didn't load Google Maps correctly. See

**ABOUT FERROSAFE**

Ferrosafe is a eco-friendly, environmentally safe vegetation management company, serving industries like railroads, departments of transportation, utilities, and pipelines. All of these industries require strict, government-approved standards of quality control and carbon-footprint impacts.

We at Ferrosafe pride ourselves in working safely and efficiently from start to finish. From purchasing chemicals and equipment, all the way to application of herbicide, Ferrosafe is committed to excellence in every area of vegetation management.

**CONTACT FERROSAFE**

Name

Email

Type your message...

Enter Captcha

Not readable? Change text.

EXHIBIT L



C O N T A C T   F E R R O S A F E

## FOR ALL YOUR QUESTIONS

### Let Us Know What Ferrosafe Can Do For You

Feel free to use any of the relevant contact information or the form to the right to get a hold of us here at Ferrosafe with your comment or question!



CONTACT FERROSAFE

Matt Zoost
Po Box 1709
Zillah, Wa 98953
Email: info@ferrosafe.com
Phone: 509-829-5600

ABOUT FERROSAFE

Ferrosafe is a eco-friendly, environmentally safe vegetation management company, serving industries like railroads, departments of transportation, utilities, and pipelines. All of these industries require strict, government-approved standards of quality control and carbon-footprint impacts.

We at Ferrosafe pride ourselves in working safely and efficiently from start to finish. From purchasing chemicals and equipment, all the way to application of herbicide, Ferrosafe is committed to excellence in every area of vegetation management.

CONTACT FERROSAFE

Name

Email

Type your message...

Enter Captcha

Not readable? Change text.

SEND MESSAGE

# EXHIBIT M



CONTACT FERROVIA

## FOR ALL YOUR QUESTIONS

### Let Us Know What Ferrovia Can Do For You

Feel free to use any of the relevant contact information or the form to the right to get a hold of us here at Ferrovia with your comment or question!

**Name \***

**Email \***

**Let us know how we can help \***

**CAPTCHA**

☐ I'm not a robot    reCAPTCHA
Privacy - Terms

SUBMIT

CONTACT FERROVIA

Ryan Cammack
459 N. Dean Road, Suite B
Auburn, AL 36830
Email: rcammack@ferroviallc.com
Phone: 1-866-607-6529

ABOUT FERROVIA

Ferrovia is a eco-friendly, environmentally safe vegetation management company, serving industries like railroads, departments of transportation, utilities, and pipelines. All of those industries require strict, government-approved standards of quality control and carbon-footprint impacts.

We at Ferrovia pride ourselves in working safely and efficiently from start to finish. From purchasing chemicals and equipment, all the way to application of herbicide, Ferrovia is committed to excellence in every area of vegetation management.